Anita JONES, Plaintiff,

v.

CITY OF CHICAGO, Defendant.

Gloria PADILLA, Plaintiff,

v.

CITY OF CHICAGO, Defendant.

Nos. 82 C 2943, 82 C 6390.

United States District Court,
N.D. Illinois, E.D.

April 23, 1985.

Stephen Seliger, Joseph M. Burns, Jacobs Burns Sugarman & Orlove, Chicago, for plaintiff.

James D. Montgomery, Corp. Counsel, Jonathan P. Siner, Sr. Atty.-Supervisor, Sharon A. Zogas, Asst. Corp. Counsel, Chicago, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Anita Jones ("Jones") and Gloria Padilla ("Padilla") have separately sued the City of Chicago ("City") for damages arising from alleged sexual assaults by Dr. Luis D'Avis during the course of his gynecological examinations of the two women at a City Department of Health ("Department") fa-

cility.[1] City now moves under Fed.R.Civ.P. ("Rule") 56 for summary judgment in each case. For the reasons stated in this memorandum opinion and order, both City's motions are granted.

### Basic Facts Underlying Plaintiffs' Claims [2]

On June 11, 1981 Jones went to a Department facility for a gynecological examination. During the course of that examination Dr. D'Avis, a City employee at the facility, sexually assaulted her. Jones reported the incident later that same day and City began an investigation. Dr. D'Avis was permitted to continue his practice during the investigation. On November 13, 1981 City's investigative agency (which is wholly independent of Department) found Jones's charges "not sustained." On March 1, 1982 Dr. D'Avis sexually assaulted Padilla during a gynecological examination.

### Contentions of the Parties

Plaintiffs argue City's liability for Dr. D'Avis' actions arises from City's failure to:

1. institute a formal policy either (a) requiring the presence of a female nurse or attendant at gynecological examinations by male physicians or (b) at least informing patients of their right to request such a chaperon;

2. "monitor" physician practices to determine why certain physicians did not permit nurses to chaperon gynecological examinations; and

3. conduct a proper investigation of complaints against Dr. D'Avis and take disciplinary action against him.[3]

City responds:

1. Its policies with respect to chaperonage were consistent with prevailing and accepted medical practice.

2. Its investigation of the Jones incident was thorough.

3. Jones's complaint was the first ever received by City against any physician alleging sexual misconduct.

### Parties' Submissions on the Current Motions

1. *Standard Medical Practice Concerning Chaperons*

City has tendered three affidavits to prove no medical community standard requires the presence of a female chaperon during gynecological examinations by male physicians:[4]

(a) Dr. Ervin E. Nichols, Director of Practice Activities and member of the Committee on Gynecologic Practice (the "Committee") at the American College of Obstetrics and Gynecology (the "College") in Washington, D.C., states no such medical community standard has existed within the past 20 years (Aff. ¶ 5). Although the College has never had a formal policy regarding chaperons, the Committee has addressed the question directly. Its conclusion, consistent with Dr. Nichols' own opinion, was that the presence or absence of a chaperon should be "at the individual option of the physician and after questioning the pa-

---

**1.** Plaintiffs originally sued Dr. D'Avis as well, but this Court dismissed the claims against him in the "Opinion," 580 F.Supp. 403 (N.D.Ill.1984).

**2.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovants—here, Jones and Padilla. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of facts adhere to those principles. Most significantly, though both

women and Dr. D'Avis are still litigating in the Circuit Court of Cook County the issue whether any sexual assaults took place, this opinion assumes they did.

**3.** Although plaintiffs originally also charged City with improper training of physicians, they have apparently dropped that charge. At least it has not been argued in response to City's argument on that issue, so it will be considered as waived.

**4.** Dr. Herbert Slutsky, personnel director for Department, also testified to the identical effect at his deposition (Dep. 98).

tient as to her desires" (Aff. ¶ 3). In fact Dr. Nichols' 1981 opinion (given in response to a specific inquiry from the editors of the *AMA Journal*) was that the question whether a chaperon should be present at all such examinations would have been answered "yes, with possible exceptions" 30 years earlier, but that the answer in 1981 was simply "no" (Aff. ¶ 4). As he then said (*id.*):

> In general, at the first visit, particularly with a teenager, an attendant may be desirable. This holds true even if the physician is a woman. The teenager may wish to have a hand to hold.[5]

(b) Dr. Robert Bouer, Chairman of the Department of Obstetrics and Gynecology of St. Joseph's Hospital in Chicago, says there is currently no medical community standard in the Chicago area requiring chaperons (Aff. ¶ 3). No such standard has existed for at least 20 years (Aff. ¶ 4).

(c) Dr. Donald R. Dye, Department's Director of Maternal and Infant Care from 1973 until 1982, says for at least the past 25 years there has been no medical community standard in the Chicago area requiring chaperons except (1) for a teenager's first examination and (2) when a patient specifically requests a chaperon.

Plaintiffs have sought to rebut that affidavit testimony by reference to several items:[6]

1. Dr. Dye, in his capacity as Director of Women's Health,[7] wrote a memorandum (Pl.Ex.C) to Medical Deputy Commissioner Dr. David McNutt one month after the Jones incident. Dr. Dye there urged adoption of a policy requiring chaperons at pelvic examinations in City's facilities. Nowhere in the memorandum does Dr. Dye even suggest chaperons are required by medical community standards. In part the memorandum summarizes the practices at five Chicago area facilities and the recommendations of the *Standards of Obstetric and Gynecological Care* (1974). Again, despite plaintiffs' puzzling assertion to the contrary (Mem. 8), those summaries reflect that neither any of the identified institutions nor the treatise *requires* the presence of a chaperon as a matter of course.[8]

2. Plaintiffs' Mem. 9–10 quotes (without providing a copy or page reference) T.H. Green, *Gynecology—Essentials of Clinical Practice* (1977):

> A nurse or other female attendant should always be present for the physical examination if the gynecologist is male.

3. Plaintiffs' Mem. 10 cites (a) an article by a fourth year medical student (S. Clyman, *Why Do We Chaperone the Female Pelvic Exam?*, 54 Del.Med.J. 105 (1982)) for the proposition that "almost all male physicians call in a nurse or other female attendant to chaperone their pelvic examinations"[9] and (b) an-

---

5. From that statement it is obvious the focus, as perceived by Dr. Nichols, was not on preventing sexual misconduct by the doctor but rather on easing the patient's apprehensions about the nature of the examination.

6. Plaintiffs also argue Title X guidelines applicable to Department require chaperons. But those guidelines, which are stated as a recommendation and not a requirement in any event, do not purport to establish (nor do they necessarily reflect) medical community standards. Parenthetically, because Department received no Title X funds during the period in which the Jones and Padilla assaults occurred (Green Aff.), those guidelines (even had they mandated chaperons, as they did not) were not binding on City.

7. Although Dr. Dye's curriculum vitae and affidavit list his title as Director of Maternal and Infant Care, most of the testimony referred to him as Director of Women's Health.

8. In the same way, neither Brown Dep. 12 nor Slutsky Dep. 78–79, both cited by plaintiffs, says any institution in Chicago required chaperons as a matter of course.

9. Clyman began his article by asserting that practice as a fact, but without offering any source or support for his statement. Interestingly, the thrust of his argument thereafter is that the primary purpose of such a practice should be the patient's comfort, rather than the alternative goal of protecting the doctor against false allegations of misconduct. According to Clyman, the latter purpose should logically ex-

other article (Registered Nurse A. Burgess, *Physician Sexual Misconduct and Patients' Responses*, 138 Amer.J. Psychiatry 1335 (1981)) for the concept "that females have been sexually abused by physicians during these exams and often feel powerless to stop the physician."

### 2. *Practice as to Chaperons at City Facilities*

Throughout the period relevant to these actions City had no policy of requiring a chaperon to be *present* at every pelvic examination (Slutsky Dep. 98). Rather a nurse was always assigned to be *available* should the physician or patient require assistance (Izenstark Aff. ¶ 3; Izenstark Dep. 69; Hairston Dep. 12).

Each of the testifying physicians and administrators negated any requirement of a chaperon (Muriel Dep. 34–35; Slutsky Dep. 98; D'Avis Dep. 40). Nor was any physician aware of a policy requiring him to inform patients they had a right to have a chaperon present (Muriel Dep. 34–35; Dye Dep. 55; Levinson Dep. 24–25). Each physician understood it was up to him to decide whether a chaperon was necessary (Slutsky Dep. 78–79; Muriel Dep. 34–35; Dye Dep. 53–55; D'Avis Dep. 40), although they uniformly indicated they honored patients' requests to have chaperons (Muriel Dep. 34–35; Dye Dep. 53; D'Avis Dep. 40). Nurses generally left it to the physicians to call them into the examining room (Hairston Dep. 16; Mycyk Dep. 6–7), and one nurse said if a doctor indicated he did not want a nurse present, the nurse "wouldn't insist" (Mycyk Dep. 5).

### 3. *Complaints of Physician Misconduct Before the Jones Incident*

Dr. Dye testified he had received no complaints of "inappropriate" sexual contact or behavior by any of the City's doctors before the Jones complaint (Dep. 11). He had received complaints of "rough treatment,

harsh doctor, rough doctor, mouthy doctor," such as giving a rough (although proper) pelvic exam, failing to wear gloves or making rude comments (Dep. 11–12). Indeed the only complaints Dr. Dye had received with any arguably sexual overtones involved such possibly suggestive comments as "Do you do anything besides have babies?" (Dep. 13).

Similarly, Health Commissioner Dr. Hugo Muriel testified Jones' complaint was the first comparable one he had ever received (Dep. 129). Muriel's initial account of his conversation with Dr. Dye after the Jones complaint seemed to contradict Dr. Dye's testimony (Dep. 31–32):

A. And he [Dye] said, "Well, we always hear those kinds of complaints. Those are matters that we probably sit down with the patient and the doctor, and perhaps in most instances we resolve that." Or he indicated that it's not rare in public clinics or private clinics to have these sorts of complaints.

Q. Complaints—When we say these sorts of complaints, complaints by women that male personnel are making sexual advances?

A. Right.

Q. Or exhibits certain aggressive sexual conduct with respect to them during an examination or during a consultation?

A. I think so.

But Muriel later clarified that account, confirming Dr. Dye's deposition testimony as to his never having received a complaint of sexual advances before Jones's charge (Dep. 132–33):

THE WITNESS: Dr. Die [sic] indicated during our meeting, if I recollect well, that we never had any complaints; but we were talking in general in the medical practice. And he was referring to—I guess I didn't make it clear. He was referring to that there are complaints in cases that are brought to court by patients against medical doctors or

tend to requiring chaperonage for any examination of any part of the body of a partially or wholly disrobed female patient by a male doctor—or for examination of a male patient by a

woman doctor. What Clyman does *not* specify as a reason for the practice is protecting the patient against actual doctor misconduct.

health personnel. That's I believe what I meant to it doesn't read clearly here.

Q. All right. Now, let me specifically ask you, to your knowledge, has the Department either acquired directly or through Dr. Die or anyone else, has the Department of Health ever received any complaints before the Anita Jones incident of doctors engaging in improper sexual conduct towards patients?

A. He indicated that they never had any complaints of this nature of sexual—

Q. All right my question is—

A. —advances.

Q. My question is just a yes or no, whether it's to your personal knowledge or whether you received that information from anyone else, are you aware of any complaints of that kind before the Anita Jones incident in the Department of Health?

A. No.

Westtown Clinic Director Steve Ochoa testified he could not recall receiving any complaints before the Jones incident of physicians "talking dirty," "being inappropriate" or "making sexual moves against" patients (Dep. 20). Coordinator of Health Administration Review Richard Dymowski also said the Jones complaint was the first on record charging sexual misconduct by a City physician (Dymowski Aff.).

### 4. Investigation of Jones Incident

Shortly after the alleged June 11, 1981 assault by Dr. D'Avis, Jones complained to clinic personnel and dictated a statement describing the incident (Pl.Ex.F). Within a day or two a copy of her statement was sent to Dr. Herbert Slutsky, Department's personnel director (Slutsky Dep. 33). On June 15 Drs. Slutsky and Muriel met with Dr. D'Avis, who denied Jones's allegations and agreed to take a lie detector test (Slutsky Dep. 52–53, 56–57, 60).

Next day Dr. Slutsky met with Department Deputy Commissioner Terry Hocin, who recommended turning investigation of the Jones incident over to City's Office of Municipal Investigations ("OMI") because of Dr. Muriel's friendship with Dr. D'Avis (Hocin Dep. 21–22). In the meantime Department arranged to have Dr. D'Avis take a polygraph examination (Pl.Ex.J) and to have sworn statements taken from Jones and several nurses (Pl.Exs.H, I). Results of the polygraph examination were favorable to Dr. D'Avis (Pl.Ex.J).

On July 31, 1981 OMI received the Jones complaint and began its investigation (Maurer Aff. ¶ 4). That complaint was the first of its kind ever received by OMI (id. ¶ 5). OMI conducted an extensive investigation: numerous interviews; review of depositions, the polygraph results and other documentation assembled by Department; and background investigation of Dr. D'Avis (attachments to Maurer Aff.). On November 13, 1981 OMI determined Jones's charges were "not sustained." During the OMI investigation the State's Attorney's office had also reviewed the incident but declined to prosecute (Attachment 18 to Maurer Aff.).

While the investigation was pending, Department permitted Dr. D'Avis to continue his normal medical practice. Although Department considered requiring Dr. D'Avis to have female chaperons present during pelvic examinations, it decided not to do so. It was recommended to Dr. D'Avis that he follow such a practice, but the decision was still left with him as with all other doctors (Slutsky Dep. 105).

### 5. Post-Jones Complaints Against Dr. D'Avis

Padilla was assaulted March 1, 1982 (but she did not report it until August 10, 1982) (Pl.Ex. P). After the Padilla incident other patients lodged some complaints (involving alleged comments, not conduct of a sexual nature) against Dr. D'Avis, but the situation *before* March 1 is of course the relevant period.

On that score, nursing supervisor Barbara Izenstark began working at the Westtown Clinic (site of the Padilla assault) in

about October 1981 (Izenstark Dep. 31), four months after the Jones incident. "Several months" after she arrived at the clinic, she became aware of some complaints that patients felt uncomfortable with Dr. D'Avis because he "talked dirty" to them (*id.* at 27–28, 30).[10] Izenstark had some difficulty in her deposition pinning down dates, but it was in April 1982 (after the Padilla incident had occurred but before Mrs. Padilla had said anything about it to Department personnel) that she decided the complaints against Dr. D'Avis were serious enough to warrant compiling written statements from patients. Two such statements were taken April 14 and April 22 (Pl.Exs. N, P).

Although Izenstark was fairly certain there had been at least some complaints to nurses before March 1982 (Dep. 48), she apparently took no action before mid-April to bring the complaints to the attention of any of Dr. D'Avis' superiors. At that time she had a conversation with Dr. D'Avis' supervisor Dr. Sophie Levinson.[11]

On April 23 Drs. Levinson and Izenstark, together with Mr. Ochoa, met with Dr. D'Avis and confronted him with the recent complaints (Pl.Ex.Q). Dr. Levinson instituted a policy requiring all Dr. D'Avis' future pelvic exams to be chaperoned (*id.*). Izenstark then ordered her nurses to chaperon Dr. D'Avis' exams regardless of his wishes (Pl.Ex. O at 3). Finally, when Padilla reported her March 1 assault in August, Dr. Muriel referred the matter to OMI once again for investigation (Pl.Ex.R). One week later Dr. D'Avis resigned (Pl.Ex. 5),[12] and in October OMI closed its file for lack of jurisdiction (Pl.Ex.T).

---

**10.** Plaintiffs' Memorandum states misleadingly that other complaints about Dr. D'Avis emerged in 1981. That is not at all a fair reading of Izenstark's testimony, which certainly places the first of such complaints in 1982. As n. 18 reflects, plaintiffs owed it to this Court to be more accurate in their factual presentation.

**11.** Early in her deposition Izenstark could not pinpoint the time of her first oral report to Dr. Levinson (Dep. 53–54), but later she said their conversation was in mid-April (*id.* at 110–11).

## Standards of Municipal Liability under Section 1983

■ As this Court said in the Opinion, 580 F.Supp. at 405:

> Absent some formally promulgated standard of conduct (such as an ordinance or administrative regulation), a Section 1983 cause of action against a municipality must be grounded on some direct municipal act or omission or some municipal policy, custom or practice that in either event proximately caused the employee tortfeasor to inflict the harm on the plaintiff.

Negligence may be enough to support a Section 1983 claim for supervisory omissions causally related to the direct wrongdoing of subordinates (*McKinnon v. City of Berwyn*, 750 F.2d 1383, 1391 (7th Cir. 1984)), but *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir.1983) emphasized a municipality can be held liable for such omissions "only when there is an extremely high degree of culpability for inaction." *Lenard, id.* at 885–86 approved Second Circuit decisions holding liability for failure to supervise may be grounded only on "gross negligence" or "deliberate indifference" to the plaintiff's constitutional rights.

*Lenard, id.* also suggested (citing *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980)) such a high degree of culpability cannot be proved except by a pattern of constitutionally offensive acts, in the face of which municipal officials have refused or failed to take remedial action. Other courts too have required plaintiffs to show a pattern of offensive conduct rather than a single isolated incident. *McLelland v. Facteau*, 610 F.2d 693, 697 (10th Cir.1980); see *Means v. City of Chicago*, 535 F.Supp.

---

**12.** Dr. D'Avis said (and still says) his resignation was occasioned by the opportunity to improve his medical practice elsewhere. Consistently with the principles described in n. 2, this Court does not credit that reason, instead attributing the resignation to the problems arising from the assault charges. That does not affect the result here.

455, 459 (N.D.Ill.1982) and cases there cited.[13]

In all candor, it is simply wrong for courts to insist on a pattern of misconduct as an invariable precondition to municipal liability. *Proximate cause* is the key—and as elsewhere in the law, that means *a* proximate cause, not *the* proximate cause. Of course municipal ignoring of a series of offenses (say beatings of citizens by policemen) can be viewed as a proximate cause of the next similar offense. But it is equally obvious that with some kinds of conduct, municipal liability could follow from the *first* offense by a municipal employee. To pose an extreme example, suppose a city opted to arm all its policemen with hairtrigger automatic pistols rather than ordinary handguns. Surely a factfinder could rationally find that municipal conduct was *a* (not *the*) proximate cause of the first subsequent killing by a trigger-happy officer. In *Lenard* language, the municipality would have shown an "extremely high degree of culpability," even though only one of its employees had been guilty of misconduct.

■ But the "pattern" cases do teach a lesson important for this case: No municipality may be held liable for its indifference to the mere *possibility* of a constitutional deprivation. Rather the plaintiff must show the municipality was aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventive measures. *McLelland,* 610 F.2d at 697.

*City's Liability for the Jones Assault*

■ By those standards City cannot be held liable for Dr. D'Avis' assault on Jones. City's conduct before that incident was neither "gross negligence" nor "deliberate indifference." By all accounts, Dr. D'Avis' assault on Jones was the first of its type ever brought to City's attention. Neither Department Commissioner Dr. Muriel, Department recordkeeper Dymowski nor clinic director Ochoa was aware of any prior complaints of sexual misconduct against City physicians. Similarly, Women's Health Services Director Dr. Dye had never been made aware of a complaint of sexual misconduct beyond an assertedly suggestive comment. Clearly no prior conduct had alerted City to any degree of probability of the Jones assault.

Nor, given the evidence, need this Court decide whether City's failure to require chaperons during pelvic examinations, had it been in contravention of medical community standards, could render City liable for the Jones assault. Every affidavit indicates City's chaperon policy was consistent with that of the Chicago medical community. No admissible evidence tendered by plaintiffs leads to a contrary inference.[14]

Plaintiffs argue City departed from medical community standards by failing to require physicians to inquire whether patients desired chaperons. Once again, such a departure (if it existed) would not rise to the level of culpability required for City's Section 1983 liability. Moreover there is nothing to indicate physicians failed to

---

**13.** *Means* was written in the context of a pleading motion—one to dismiss under Rule 12(b)(6) —rather than a summary judgment motion like the current ones, when all the facts are in. Just last week our Court of Appeals specifically rejected the *Means* approach to Rule 12(b)(6) motions (one shared by this Court, as expressed in several published opinions and a large number of bench rulings). *Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985). *Strauss* is not readily defensible, except perhaps as an indefensible (though human) reaction to the high volume of ultimately unsuccessful Section 1983 cases with which federal courts (and City) are burdened. See, for an early discussion by this Court of what it views as the better solution, *Thompson v. Village of Evergreen Park,* 503

F.Supp. 251 (N.D.Ill.1980). But whichever side of the *Strauss-Means* fray one occupies does not impact the present cases, which deal with ultimate *proof* rather than initial *pleading.*

**14.** Rule 56(e), which requires all summary judgment submissions to be admissible in evidence, bars consideration of the purely hearsay statements in the book and articles cited by plaintiffs. Moreover, none of those documents speaks to the relevant medical community standards here in Chicago, as do City's submissions. And in fact plaintiffs' own submissions show no such *requirement* as plaintiffs urge is part of medical standards generally.

make such inquiries as a matter of course—or more to the point, that City was aware of any such failure. Indeed Dr. Nichols' affidavit, sought to be relied on so heavily by plaintiffs, reflected the inquiry as to chaperons would most appropriately be made by the nurse or aide who prepares the patient for her examination. Nothing in the record indicates nurses failed to make such inquiries or were not expected to do so.[15]

Finally, all the foregoing analysis makes clear City cannot possibly be found liable for a failure to "monitor" or investigate male physicians who chose not to have chaperons present during their examinations. As Dr. Nichols' affidavit reflects, such a choice may be the result of legitimate concerns of either the physician or his patient.[16] That choice cannot by any stretch be said to put City on notice—at peril of Section 1983 liability—of the material likelihood of a sexual assault.

### City's Liability for the Padilla Assault

■ All that distinguishes the Padilla claim from the Jones claim is that City was aware of Jones's charges against Dr. D'Avis before the Padilla assault. No City official then knew of any other complaints of misconduct against Dr. D'Avis. City's actions or omissions before March 1 must be measured in light of Department's internal investigation (including the polygraph examination favorable to D'Avis), the November 13 OMI finding of "not sustained" and the knowledge the State's Attorney's office had reviewed the D'Avis file and declined to prosecute.

Under the standards already discussed, the issue is whether City's failure to discipline Dr. D'Avis or to require chaperons during his pelvic examinations, in light of its knowledge of the Jones incident, constituted gross negligence or deliberate indifference to Padilla's constitutional rights. Though requiring a chaperon would (at least in retrospect) have been prudent, and though such a requirement would have prevented the Padilla assault, City's failure to mandate chaperonage does not subject it to Section 1983 liability.

It is undisputed Dr. D'Avis had an unblemished record before the Jones incident. Dr. Muriel, a fellow Bolivian and social acquaintance, had known Dr. D'Avis for many years. When Dr. D'Avis vehemently denied Jones's charge and submitted to a lie detector test with favorable results, the officials were faced with the word of a colleague against the word of a patient. Given their association with Dr. D'Avis, the obvious vulnerability of any doctor to such charges and the apparent clearing of Dr. D'Avis by the polygraph, the officials (and hence City) cannot reasonably be faulted for having resolved any doubts in favor of Dr. D'Avis.

That is not to say City's officials did not take the charges seriously. They conducted an extensive internal investigation and then turned the case over to OMI for an independent investigation. Their actions cannot be deemed to have encouraged Dr. D'Avis or to have acquiesced in his misconduct.[17] *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.1980).

Nearly nine months elapsed between the Jones charges and the Padilla incident. So far as City's officials knew, Dr. D'Avis had comported himself in a professional and perfectly acceptable manner during that

---

**15.** This line of analysis is not inconsistent with City's burden, on these motions, to demonstrate there were no genuine issues of material fact. Once the City had properly supported its motion (as it did), Rule 56(e) shifted the burden to plaintiffs to present specific facts supported by affidavits or other admissible evidence showing such a genuine issue. *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983). Where as here plaintiffs have failed to meet that burden, *they* bear the risk of any gaps in the record.

**16.** As n. 9 indicates, that is also the thesis of the Clyman article advanced by plaintiffs.

**17.** Indeed, Dr. Muriel's quick transmittal of the Padilla file to OMI (Pl.Ex.R) and Dr. D'Avis' prompt resignation (Pl.Ex.S) (see n. 11) negate any inference that City officials acquiesced in Dr. D'Avis' misdeeds or that Dr. D'Avis felt secure in engaging in them.

period. More than three months before the Padilla episode the OMI Investigative Summary had found the Jones charges "not sustained." [18]

Under those circumstances the Section 1983 standards for City immediately before the Padilla assault are not to be distinguished from those before Jones's charges. It is all too easy to second-guess what City should have done in retrospect, but that is not the Section 1983 test. City's failure to require chaperons in March 1982 cannot be deemed "grossly negligent" or "deliberately indifferent" to the constitutional rights of a patient in Padilla's position.

### Conclusion

There is no genuine issue of material fact in either case. City cannot in any sense be deemed culpable with respect to the Jones incident. Even if it could be viewed as negligent as to Padilla (a questionable conclusion in all events), any such shortcoming does not even approach the level required to render City liable under Section 1983. City is entitled to a judgment as a matter of law in each case. These actions are dismissed with prejudice.

---

**18.** Plaintiffs' Memorandum (citing to Pl.Ex.M) refers to OMI's finding as having issued in March *1982*. But Exhibit M did *not* reflect the date of OMI's finding, but rather the date OMI wrote a letter to Dr: D'Avis about the matter. OMI's report itself is specifically dated November 13, 1981, and Dr. Slutsky's affidavit states Department received the report at that time. At least equally significant, Paragraph 10 of City's "statement of material facts as to which there is no genuine issue" (filed in compliance with this District Court's General Rule 12(e)) specified the November 13 date, and defendants' response under General Rule 12(e) identified that paragraph as one of the *undisputed* group of facts. This is not the only instance in which Plaintiffs' Memorandum was unfaithful to the record, either directly or by some degree of mischaracterization of the facts.