Anita JONES, Plaintiff-Appellant,

v.

CITY OF CHICAGO,
Defendant-Appellee.

Gloria PADILLA, Plaintiff-Appellant,

v.

CITY OF CHICAGO,
Defendant-Appellee.

Nos. 85–1906, 85–1907.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1986.

Decided April 4, 1986.

---

Stephen G. Seliger, Stephen G. Seliger, Ltd., Chicago, Ill., for plaintiff-appellant.

Ruth M. Moscovitch, Asst. Corp. Counsel, Chicago, Ill., for defendant-appellee.

· Before CUMMINGS, Chief Judge, RIPPLE, Circuit Judge and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Chief Judge.

Appellants in this consolidated appeal are patients of Chicago public health clinics who claim that a physician sexually assaulted them during the course of gynecological examinations. Both contend that the City of Chicago ("City") and the physician deprived them of their liberty and privacy interests and seek damages under 42 U.S.C. § 1983; appellants also appended various state law tort claims against both the City and the physician. The district court dismissed all claims against the physician in addition to the state claims against the City and granted summary judgment in favor of the City on the Section 1983 claim. Appellants appeal.[1] We affirm the grant of summary judgment.[2]

Appellants Anita Jones and Gloria Padilla had been going to the City's neighborhood health clinics for a number of years. During visits in 1981 and 1982, Jones and Padilla were seen by Dr. Luis d'Avis. D'Avis had been employed as a physician with the City's Department of Health ("Department") since October 1, 1980,[3] and was assigned to work at its West Town clinic though on occasion he would fill in at the other neighborhood clinics. On June 11, 1981, Jones reported to the staff of the clinic located at 4942 West Division that d'Avis had sexually assaulted her earlier that day during an examination. The charge triggered an immediate internal investigation, but the investigation was turned over to Chicago's Office of Municipal Investigation ("OMI")[4] the following month. On November 13, 1981, OMI determined that Jones' charge was "not sustained" and informed d'Avis by letter on March 3, 1982.

Meanwhile d'Avis continued his duties as a City public health physician. He saw Gloria Padilla at the West Town clinic on four occasions in 1981 (all after the Jones incident) and once in 1982. Padilla charges that d'Avis sexually assaulted her at the time of her last visit. The incident oc-

---

1. Appellants do not challenge the district court's dismissal of their pendent state law claims.

2. Shortly before argument the court was informed that a settlement had been reached as to appellants' claims against the physician, Dr. Luis d'Avis. On motion, the court dismissed d'Avis from the appeals. We therefore express no opinion as to the correctness of the district court's order regarding the claims against d'Avis. See *Padilla v. d'Avis,* 580 F.Supp. 403, 406–408 (N.D.Ill.1984).

3. D'Avis is no longer employed with the City. He submitted his resignation to the Department of Health two weeks after Padilla reported her charge of misconduct.

4. OMI is a separate entity from the City of Chicago and completely distinct from and independent of the City's Department of Health. Its specific function and purpose is to conduct investigations of charges of improper conduct by City employees.

curred on March 1, 1982, but Padilla did not report the misconduct until August 23, 1982. OMI initiated another investigation of d'Avis; an OMI investigator interviewed Padilla but decided to terminate the investigation (and thus issued a finding of "not sustained") because d'Avis had tendered his resignation and was no longer a City employee. See *supra* note 3.

Jones filed her civil rights action in federal court on May 11, 1982; Padilla filed hers on September 13, 1983. They both claim that the City failed to monitor and supervise its physicians (and in particular d'Avis) properly and that it had no policy which required physicians to have an attendant in the examination room or to inform female patients of their right to a chaperone's attendance during a pelvic examination; additionally, Padilla charges that the City failed to investigate adequately patient complaints of physician misconduct (notably Jones' charge). In line with the limitations placed on municipal liability under Section 1983, see *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611; *Hossman v. Blunk*, 784 F.2d 793 (7th Cir.1986) (per curiam), Jones and Padilla claim these acts and omissions constitute policies or customs that resulted in their injuries.

The district court determined that by all accounts d'Avis' assault on Jones was the first of its type ever brought to the City's attention. Under the circumstances, the court found it unnecessary to decide whether the City's failure to require physicians to have chaperones during pelvic examinations or to inquire whether patients desired chaperones departed from community medical standards; given the evidence, the City's culpability for its physician's misconduct was neither grossly negligent nor deliberately indifferent. *Jones v. City of Chicago*, 608 F.Supp. 994, 1000 (N.D.Ill. 1985). The district court also found the Padilla assault essentially indistinguishable from the Jones assault because City offi-

cials took the latter charge seriously and conducted an independent investigation in addition to an extensive internal investigation though the City resolved the matter in favor of d'Avis. *Id.* at 1001–1002. The district court accordingly determined that the City was not culpable under Section 1983 with respect to either assault.

Under *Monell v. Department of Social Services*, a plaintiff may establish municipal liability for deprivations of a constitutionally protected interest if she can show the existence of a policy or custom and a sufficient causal link between the policy or custom and the constitutional deprivation. 436 U.S. at 690–694, 98 S.Ct. at 2035–2037.[5] Further, *Monell*'s proscription on vicarious liability or a *respondeat superior* theory makes plain that the " 'policy or custom' requirement ... was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers." *City of Oklahoma City v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (plurality opinion); *id.* 105 S.Ct. at 2438–2439 (Brennan, J., concurring). A city thus may not be held liable under Section 1983 for every constitutional violation caused by its policies or customs; they must be at fault (or culpable) in some sense for establishing or maintaining the policy or custom. Additionally, it now appears that at least as to certain constitutional deprivations the plaintiff may have to present proof of fault beyond mere negligence on the part of the City in establishing the policy or tolerating the custom. See *Daniels v. Williams*, —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (prison official's negligent conduct causing unintended loss of or injury to life, liberty or property does not constitute a violation of the Due Process Clause of the Fourteenth Amendment); *Davidson v. Cannon*, —— U.S. ——, 106 S.Ct. 668, 88 L.Ed.2d 677 (same).

Appellants clearly present no facts that tend to show d'Avis' misconduct "imple-

---

**5.** The *Monell* Court did not address "the full contours of municipal liability under § 1983" since it found that the case before it "unques-

tionably involves official policy." 436 U.S. at 694–695, 98 S.Ct. at 2038.

ments or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City]." *Monell v. Department of Social Services,* 436 U.S. at 690, 98 S.Ct. at 2035–2036. But governmental customs, in contrast to official policies, do not receive "formal approval through ... [the local government's] official decisionmaking channels," *Monell v. Department of Social Services,* 436 U.S. at 690–691, 98 S.Ct. at 2036; rather, they are simply " 'persistent and widespread ... practices of ... officials.' " *Id.* at 691, 98 S.Ct. at 2036. The word "custom" generally implies a habitual practice or a course of action that characteristically is repeated under like circumstances. See Webster's Third New International Dictionary of the English Language 559 (unabridged edition) (1963). Plainly, there is evidence of the frequency and pattern of certain practices of employees at the City's neighborhood clinics from which the existence of a custom reasonably can be inferred. See Eric Schnapper, *Civil Rights Litigation After Monell,* 79 Colum.L.Rev. 213, 229 (1979). The City's admitted practice of having a chaperone available but not in attendance during gynecological examinations (irrespective of whether or not it conformed to community medical standards) was its regular, operating procedure and therefore may establish a custom under *Monell.* Similarly, the City concedes that it never required its physicians or clinic staff to advise patients that they could have a chaperone present during any examination; it was the usual custom and practice to leave the matter to the physician.

■ But *Monell* requires more. At the very least there must be an "affirmative link" between the custom at issue (especially when the custom itself does ˙not establish wrongdoing) and the constitutional deprivation alleged to cast blame on the City. *City of Oklahoma City v. Tuttle,* 105 S.Ct. at 2436. This is not to say that a city is absolved from fault where it takes no action. To the contrary, inaction in response to misconduct of its employees may result in municipal liability but only where the injury is caused by "faults 'systemic in

nature,' " *Strauss v. City of Chicago,* 760 F.2d 765, 770 (7th Cir.1985), citing *Powe v. City of Chicago,* 664 F.2d 639, 651 (7th Cir.1981); the isolated act of an employee generally is not sufficient to impose municipal liability. See *Monell v. Department of Social Services,* 436 U.S. at 694, 98 S.Ct. at 2037 (a municipality cannot be held liable solely because it employs a tort-feasor); cf. *Pembaur v. City of Cincinnati,* —— U.S. ——, ——, 106 S.Ct. 1292, 1293, 89 L.Ed.2d 452 (1986) ("municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances"); *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 284 (7th Cir.1986) (single act of high-level policymaker can render local government liable under Section 1983). Further, in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable. See, e.g., *Avery v. County of Burke,* 660 F.2d 111, 114 (4th Cir.1981); *Murray v. City of Chicago,* 634 F.2d 365, 366–367 (7th Cir.1980) (failure of responsible officials to establish appropriate procedures for the prevention of serious malfunctions in the administration of justice implicates dereliction of duty of constitutional dimension for which municipality may be held liable under Section 1983), certiorari granted *sub nom. Finley v. Murray,* 454 U.S. 962, 102 S.Ct. 501, 70 L.Ed.2d 377, certiorari dismissed, 456 U.S. 604, 102 S.Ct. 2226, 72 L.Ed.2d 366. We take *Tuttle's* "affirmative link" requirement to mean that there must be some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation. See *Hays v. Jefferson County, Kentucky,* 668 F.2d 869, 873–874 (6th Cir. 1982), certiorari denied, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73.

■ Further, the quantum of evidence needed is considerably greater where, as here, the particular customs that appellants claim resulted in their injuries involve a course of municipal inaction that is a good deal removed from the constitutional depri-

vation alleged. A plaintiff that faults a municipality's inaction must show that there is an "extremely high degree" of municipal culpability. *Lenard v. Argento,* 699 F.2d 874, 885 (7th Cir.1983), certiorari denied, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84; cf. *Strauss v. City of Chicago,* 760 F.2d at 769 (inaction that is "sufficiently egregious" may render municipality liable for single injury under Section 1983). As the district court stated below:

> No municipality may be held liable for its indifference to the mere *possibility* of a constitutional deprivation. Rather the plaintiff must show the municipality was aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures.

*Jones v. City of Chicago,* 608 F.Supp. at 1000 (emphasis in original). Where the custom itself does not establish wrongdoing, there must be evidence of a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts. See *Lenard v. Argento,* 699 F.2d at 886.

In *Avery v. County of Burke, supra,* the plaintiff was a patient of a county health department clinic. She claimed that the county wrongfully caused her sterilization after county health employees informed her that she had the sickle cell trait but subsequent testing revealed that plaintiff did not have the trait. The court initially noted that the state expressly had imposed on local health departments the duty to provide testing and counseling for state residents afflicted with sickle cell syndrome. It then reasoned that the failure of the county boards of health and social services to adopt procedures for its employees in counseling and sterilizing persons believed to have the sickle cell trait constituted a "custom" of leaving these activities to "the standardless discretion" of the individual employees. *Avery v. County of Burke,* 660 F.2d at 115. Because the county had a substantial black population and the board of health was involved in the sterilization of women, the court concluded that an in-ference of deliberate indifference to the plaintiff's constitutional right of procreation (see *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)) or tacit authorization of sterilization was reasonable. *Id.* at 115–116. The court therefore held that genuine issues of material fact remained as to the county's liability for wrongful sterilization and precluded summary judgment. The circumstances of the present cases are dissimilar.

Appellants admittedly have shown that the presence of chaperones during pelvic examinations is desirable and that it may be best to ensure that a patient is aware of a chaperone's availability. We doubt that the City disagrees. But the City disputes appellants' contention that it is required to adopt procedures for its physicians (and other employees) to follow in these matters. In support of its motion for summary judgment, the City offered the affidavits of several physicians to establish that neither national nor community medical standards require the presence of a chaperone during gynecological examinations. Further affidavits from Department officials and staff indicate that the Jones incident was the first of its kind at City public health facilities; the Department had no record of prior complaints of sexual misconduct or improprieties against d'Avis or any other City physician.

▬ To defeat the City's summary judgment motion, it was incumbent on appellants to show that they would produce "specific facts" at trial which could establish a deliberate indifference to their constitutional rights or tacit authorization of the employee misconduct. See Fed.R.Civ.P. 56(e). It is enough that appellants offer circumstantial evidence from which a trier of fact may reasonably infer the City's culpability. See *Klein v. Trustees of Indiana University,* 766 F.2d 275, 283 (7th Cir.1985). But to this end, "[w]e are 'not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, ... only reasonable ones.'" *P.H. Glatfelter Co. v. Voith, Inc.,* 784 F.2d

770, 774 (7th Cir.1986) (emphasis in original) (citations omitted). After carefully reviewing the record in the light most favorable to appellants, *id.*, we conclude that appellants' evidence does not give rise to an inference of fault so as to render the City liable under Section 1983.

Appellants' initial response to the City's motion is that there is no clearly defined medical standard on the chaperone issues. They submit a short, one-sentence excerpt from a medical text (T.H. Green, *Gynecology-Essentials of Clinical Practice* (1977)) stating that "[a] nurse or other female attendant should always be present for the physical examination if the gynecologist is male." Additionally, appellants cite two articles from medical journals. In one, a fourth-year medical student begins with the undocumented assertion that "almost all male physicians call in a nurse or other female attendant to chaperone their pelvic exam of a female patient" for either the patient's comfort or the legal protection of the physician (he does not advocate that the practice exists or should be required for patient protection against physician misconduct). In the other, a registered nurse reports on patient interviews involving one gynecologist who conducted examinations of 16 women in a sexually abusive manner. Appellants also make the most of Dr. Hugo Muriel's initial account of a conversation with Dr. Donald Dye, the Department's Director of Women's Health, that took place shortly after Jones' complaint of misconduct. Muriel, the Department's Commissioner, recalled that Dye told him that " 'we always hear those kinds of complaints [of sexual advances]. Those are matters that we probably sit down with the patient and the doctor, and perhaps in most instances we resolve that.' Or he indicated that it's not rare in public clinics or private clinics to have these sorts of complaints."

(Muriel later "clarified" this account, stating that he and Dye "were talking in general in the medical practice.") With the exception of this single reference, appellants came forward with no specific instances (before the Jones case) where patients reported sexual misconduct by City physicians.

The material that appellants submit hardly gives rise to a reasonable inference of fault on the part of the City. First, Muriel's statement amounts to little more than a bald and conclusory statement, void of the requisite specific facts to oppose a summary judgment motion. See *In the Matter of Morris Paint and Varnish Co.,* 773 F.2d 130, 136 (7th Cir.1985); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985). Appellants do not identify any case or physician accused and present no specifics of the number and nature of the accusations or the circumstances involved. The generalized evidence offered bears no relation to appellants' injuries. See *Strauss v. City of Chicago,* 760 F.2d at 769. Second, apart from the questionable admissibility of their documentary and other evidence, see Fed.R.Civ.P. 56(e),[6] appellants' submissions provide no support for a requirement (as part of medical standards or other guidelines) of a chaperone's presence in the examination room or of an inquiry as to the patient's desires in the matter. Moreover, appellants produced no evidence that the lack of such requirements left the City's physicians with "standardless discretion" as to the appropriate procedures for conducting gynecological examinations. Long aware of the potential for sexual misconduct in the physician-patient relationship, the medical profession proscribes the bounds of its membership's conduct.[7] Whatever the prevailing community

---

6. Rule 56(e) states in part:

 Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

 Fed.R.Civ.P. 56(e).

7. "In every house where I come, I will enter only for the good of my patients, keeping myself far from all intentional ill-doing and all seduction, and especially from the pleasures of love with women and men." Hippocratic Oath, Steadman's Medical Dictionary, 579 (22d ed. 1972).

medical standard (a cause of dispute between appellants and the City which we find immaterial), a physician knows (and the City properly may expect) that his conduct must not exceed the bounds of his oath and ethical obligations. The record, viewed in the light most favorable to appellants (see *P.H. Glatfelter Co. v. Voith, Inc.*, at 774), plainly does not allow the inference that the City was culpable (much less to the extent required in *Lenard v. Argento, supra*) with respect to the Jones incident.

 As the district court correctly points out, what distinguishes Padilla's claim from Jones' claim is the fact that the City was aware of Jones' charge against d'Avis before the Padilla assault.[8] Had the City ignored the Jones incident and not addressed her complaint, Padilla might well lay claim to the existence of a genuine issue of material fact. In that event, it may well be reasonable to infer the City's deliberate indifference to the protection and well-being of public health clinic patients. Cf. *Black v. Stephens*, 662 F.2d 181, 190–191 (3d Cir.1981) (police chief's failure to institute adequate investigatory procedures for determining if and when discipline of police officer may be required constitutes an official policy encouraging use of excessive force), certiorari denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). But that is not the case here.

The Jones assault was the subject of two investigations by the City, one by d'Avis' supervisors at the Health Department and the other by OMI. The Department began its investigation on June 15, 1981 when Dr. Muriel assigned the Department's then Director of Personnel, Dr. Herbert Slutsky, to the case. Slutsky interviewed d'Avis the same day. d'Avis denied the allegations and agreed to take a polygraph test. The examination took place on June 24, 1981 in Slutsky's presence, and the examiner concluded that d'Avis' answers (in which he again denied Jones' allegations) were not deceptive. Within the following week, Slutsky interviewed Jones and four nurses that were on duty at the time the assault took place. Following this preliminary investigation, Dr. Muriel decided to refer the Jones complaint to OMI, and the matter was turned over on July 31, 1981. The Department issued no findings of its own and took no further action at that time.

OMI immediately began its investigation into the charges. It conducted separate interviews of Jones and the same four employees of the clinic's staff. It inquired into d'Avis' status with the Illinois Department of Registration and Education and reviewed the records of the Chicago Police Department's concurrent investigation. Lastly, in furtherance of its investigation, OMI turned its files over to the State's Attorney's Office which declined to prosecute d'Avis based upon Jones' decision not to pursue criminal action in favor of civil remedies. Based on its review of the allegations, OMI found Jones' charge "not sustained" and the Department took no disciplinary action against d'Avis. Given the extent of the investigation into the matter, the City's decision to clear d'Avis of misconduct in connection with the Jones incident and not institute a formal policy requiring the presence of a chaperone during all (or at least as to d'Avis') gynecological examinations cannot be faulted. Though in retrospect the City's decision may be second-guessed (particularly in light of Padilla's complaint), it allows no inference that the City is to be blamed for d'Avis' assault on Padilla.

**8.** After the Padilla assault on March 1, 1982, other patients lodged complaints (involving alleged comments but not conduct of a sexual nature) against d'Avis, and appellants provide the statements of two patients, one taken April 14, 1982 and the other April 22, 1982. But these statements of course are not relevant to Padilla's claim. Padilla points to only one bit of evidence to support her assertion that the City had knowledge which compelled it to watch d'Avis more closely *before* March 1, 1982. Barbara Izenstark, supervisor of nursing at the West Town clinic, stated that she was fairly certain there had been at least some complaints about d'Avis reported to her nurses before March 1982. But again, this general (and quite obviously hearsay) statement of nurse Izenstark does not provide the necessary specifics to oppose a motion for summary judgment. See Fed.R.Civ.P. 56(e).

Appellants' further assertion that the investigation was skewed to disprove Jones' charge and clear d'Avis of wrongdoing fares no better. It is true that d'Avis and Dr. Muriel were both from Bolivia and friends for many years. It is quite another matter to infer that some kind of cover-up therefore must have occurred. Indeed, one of the reasons that the Jones case was referred to OMI was due to Muriel's friendship with d'Avis. Muriel wanted it to "be clear that I wasn't covering up anything, because of that friendship." Because of the intervening investigations and resolution of the Jones charge, the Padilla incident is tantamount to an isolated case of improper conduct of a non-policymaking employee which cannot render the City liable under Section 1983. See *Malak v. Associated Physicians, Inc.*, at 284.

For the reasons we set out above, the grant of summary judgment in favor of the City and against appellants is AFFIRMED.