859 F.2d 153
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jessie Mae SUTTLES, Administratrix of the estate of Wadie E.
Suttles, Sr., deceased, Plaintiff-Appellant,
v.
CITY OF CHATTANOOGA, TENNESSEE; Officers Mike Williams and
Melvin Carson, Defendants-Appellees
 No. 86-5897.
 United States Court of Appeals, Sixth Circuit.
 Sept. 26, 1988.
 
 Before MERRITT and KRUPANSKY, Circuit Judges, BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Jessie Mae Suttles, as administratrix of the estate of her deceased husband, Wadie E. Suttles, Sr., brought this action under 42 U.S.C. section 1983 to recover damages for the death of her husband whose death occurred following an injury to his head while he was an inmate of the jail of the City of Chattanooga. The action was brought against the City and several officers who were employed at the jail at that time. Some of the officers who were sued were dismissed without objection before the case was submitted to the jury. The jury found in favor of two other officers, Williams and Carson; plaintiff's motion for a new trial with respect to them was denied, and there is no appeal as to them. The jury hung as to the City, and the district judge then granted the City's motion for a directed verdict that had been denied prior to submission of the case to the jury. The grant of the directed verdict is the subject of this appeal. We affirm the district court.
 
 
 2
 Under the complaint as filed, and even as amended, the theory of liability alleged as to the City was that Suttles, who was mentally ill, had received the injury to his head in an altercation that he had in the jail during which he was struck with a slapjack and that this allegedly illegal use of force resulted from a policy and practice of the City in its administration of the jail. It was alleged that the infliction of the injury was in violation of the fourth, eighth and fourteenth amendments. However, the case was permitted to be tried on the theory that Suttles' injury to the head may have been incurred by his being struck by another prisoner, or when he fell from his bunk, or intentionally struck his head on the bars of his cell. The theory of liability as to the City here was that, under its grossly negligent policy and practice, its jail personnel did not receive adequate training with the result that they were grossly negligent in the supervision of Suttles who was mentally ill or that the City had a grossly negligent policy and practice of making no distinction between mentally ill and normal prisoners and in the handling and protection of mentally ill prisoners so that Suttles, through gross negligence of jail personnel, received the injury to the head that caused his death. An additional theory of liability was that, however Suttles may have received the injury to the head, as a result of a grossly negligent policy and practice of the City, there was a deliberate indifference by the jail personnel to the medical needs of Suttles which was affirmatively linked to Suttles' death.
 
 
 3
 The position of the City is that there was no evidence from which the jury could within reason have found a breach of constitutional duty on the part of the City and that such breach was affirmatively linked to the death of Suttles.
 
 
 4
 * Wadie Suttles, Sr., decedent, had a long history of mental problems. He was treated at various Veterans' Administration hospitals and state psychiatric centers, and was hospitalized in 1978 through a judicial proceeding initiated by his family. The incident from which this action arose began when Suttles was arrested on November 25, 1983, and charged with disorderly conduct. He was taken to a hospital for treatment for injury received during his arrest, but refused treatment. He was then taken to the Chattanooga city jail. Two days later, bail was arranged by his family, but Suttles refused to sign the bond papers, protesting that there was no just cause for his arrest. On December 1, the jail supervisor directed Suttles be taken to a hospital because his behavior was erratic and he refused to eat, but this order was not immediately followed. Later that same day, defendants Mike Williams and Melvin Carson, who were jail officers, had an altercation with Suttles when they attempted to delouse him, during which Suttles was allegedly struck in the head by Officer Carson with a slapjack.
 
 
 5
 Suttles was taken to the hospital at approximately 5:00 p.m. after the altercation. The attending physician noted bruises on his arm, but no physical signs of trauma to his head. Suttles was uncooperative and combative, and he was prescribed a mild sedative. Because he had not eaten in several days, a blood count was taken and intraveneous treatment was administered. The emergency room physician did not see any medical or psychiatric reason to admit Suttles, even though she knew he was brought in for bizarre behavior. She did not consider him to be suicidal or homicidal and did not believe a psychiatric consultation was necessary. The physician also testified that had she known of Suttles' medical history (hospitalizations for mental disorders and diagnosis of schizophrenia), she did not know that she would have acted differently.
 
 
 6
 After returning to the jail in the early evening, Suttles went to sleep. There was a shift change of jail officers and during rounds at 1:00 a.m. and 1:40 a.m. on December 2, the officer then on duty noted that Suttles was making a lot of noise and disturbing the other prisoners. He paced his cell and knocked his head against the cell bars. At one point, he turned a somersault on his bunk. After hearing a call of "man down," the jail officer found Suttles unconscious, without a pulse, on the floor. Emergency cardio-pulmonary resuscitation (CPR) was administered until the ambulance arrived and transported him to the hospital.
 
 
 7
 The emergency room physician determined that Suttles was brain dead and he was placed on a respirator. He did not regain consciousness and died on December 6. Although there were no visible signs of injury, an autopsy revealed that a ten-centimeter skull fracture was the cause of death. While the expert testimony was that the skull fracture could have been caused by a slapjack, the fracture was so acute that Suttles would not have been able to walk or talk after the injury as he had done after the alleged incident involving Officer Carson. The pathologist opined that the autopsy revealed no other evidence that Suttles might have been beaten in the jail.
 
 
 8
 The testimony of cellmates provided an unclear cause of death. One prisoner testified that Suttles was struck by a jail officer with a poker, another said he was struck by a fellow inmate after his return from the hospital, another stated that he fell from his bunk, and another maintained that he collapsed after banging his head against the cell bars.
 
 
 9
 The district court, in a detailed opinion granting the directed verdict for the City, held that the proof did not meet the test of City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985), to show inadequate training because City policies did not approach negligence and because there was no affirmative link between any policy or custom and Suttles' death. The court found that there was no evidence that officers knew of Suttles' past treatment for mental problems and held that medical treatment at the hospital on December 1 satisfied the City's obligation not to be deliberately indifferent to the medical needs of Suttles, citing Estelle v. Gamble, 429 U.S. 97 (1976). Plaintiff Suttles filed a pro se appeal, and counsel was appointed by the court and transcript provided by the government.
 
 II
 
 10
 Preliminarily, we note that it was suggested at argument that the fact that the district court initially denied the City's motion for a directed verdict and submitted the case to the jury somehow undermines the propriety of the district court's grant of the motion after the jury hung. At the time the court denied the motion it stated that the case should go to the jury "regarding the [City's] policies of training and the policies of medical indifference." We do not believe that this argument is viable. Rule 50(b), Fed.R.Civ.Proc., of course, expressly recognizes the authority of the court to grant the motion after the jury hung after having previously overruled the motion. Moreover, it is the practice of many district courts, when in any doubt, to deny a motion for a directed verdict for a defendant and submit to the jury and then take a fresh look after a jury verdict for plaintiff or a hung jury. This practice frequently solves the trial court's problem in cases of doubtful liability by a jury verdict for defendant.
 
 
 11
 The grant of a directed verdict for the City, because no constitutional violation was shown, and in any event, because none was shown to be an affirmative link to the death, was proper if, viewing all the evidence and reasonable inferences therefrom in a light most favorable to plaintiff, a reasonable jury could not have found both of these elements of liability. Ridenour v. Lawson Co., 791 F.2d 52 (6th Cir.1986). This same standard is applied by an appellate court. Ratliff v. Wellington Exempted Village Schools Bd. of Educ., 820 F.2d 792, 795 (6th Cir.1987).
 
 Inadequate Training
 
 12
 Plaintiff alleged that the City had inadequate training of its jail officers. Testimony established that the training program met state requirements and that the state had approved the courses. Training included classes, field training, and required annual in-service training. The jail also had a procedures manual. Jail policy emphasized minimum use of force and there was a policy, consistent with Tennessee Correction Institute (TCI) guidelines, to transport ill and injured prisoners to a local hospital.
 
 
 13
 Testimony also showed that the individual officers involved had some training, although not necessarily conducted by the City of Chattanooga. Connor had been at the jail since April 1983 and had not received any training from the City. However, he had worked in Florida jails from 1977 to 1982 and was a Certified Florida Correctional Jailer. Michaels had satisfactorily completed the TCI course in March 1982. Bledsoe was not at the jail at the time of the fatal injury, but evidence showed that he also had training.
 
 
 14
 Williams had been a jailer for only five months, but had worked with the Red Bank City, Tennessee police department from 1972 to 1982. His training included the Chattanooga Police Academy and coursework in New Orleans, Nashville, and Atlanta. Also, he was a state certified police academy instructor.
 
 
 15
 Carson had been on the Chattanooga police force for 10 years and was assigned to the jail due to stress and his doctor's recommendation. He had received regular training and in-service training as a member of the police force, but had no jailer training.
 
 
 16
 Therefore, there was no evidence that the training was so inadequate as to be a basis of liability. Training was not so grossly negligent that misconduct by jail officers was a known risk or an obvious, highly probable risk. Nishiyama v. Dickson County, Tenn., 814 F.2d 277, 282 (6th Cir.1987); Rymer v. Davis, 775 F.2d 756, 757 (6th Cir.1985) (approving jury instruction requiring that risk of officer misconduct be substantially certain to occur), cert. denied, 107 S.Ct. 1369 (1987). Thus, there is no gross negligence on the part of the City as to training. See Jones v. Sherrill, 827 F.2d 1102, 1106 (6th Cir.1987) ("The facts alleged in support of the legal conclusion of gross negligence must be sufficient to charge the government officials with outrageous conduct or arbitrary use of government power.").
 
 
 17
 Moreover, there was no evidence from which the jury could within reason find that any officer's training or lack of training was linked to Suttles' death. See Rizzo v. Goode, 423 U.S. 362 (1976); Hays v. Jefferson County, Ky., 668 F.2d 869, 873 (6th Cir.), cert. denied, 459 U.S. 833 (1982). It is entirely speculative as to how Suttles received the trauma that caused his death. Accordingly, it was not necessary to submit these issues to the jury.
 
 
 18
 Gross Negligence in Operation and Maintenance of Jail
 
 
 19
 Plaintiff alleged that the jail failed to meet the TCI standards, relying heavily on inspections done in August 1981 and April 1982, resulting in citations. The jail was cited for not having separate cells for problem prisoners, a plan to deal with prisoner disturbances, or a delousing policy, and for not conducting physical examinations of prisoners and providing training to each jailer. The most recent inspection prior to Suttles' incarceration, however, conducted in February 1983, resulted in certification of the jail as a "lock-up facility." This classification has more stringent requirements than a "temporary holding facility," although it is unclear as to which type of facility the jail should be categorized. The jail is used primarily for preliminary hearing detainees who are usually released on bond or taken to the county jail. At the time of the incident, however, the county jail was refusing to accept city jail prisoners due to overcrowding.
 
 
 20
 Therefore, there was not sufficient evidence to create a jury question on whether the City operated the jail in a grossly negligent manner. Furthermore, there was no evidence from which the jury could within reason find that such operation and maintenance was affirmatively linked to the death.
 
 
 21
 Policy of Making No Distinction in Handling Mentally Ill Persons and Inadequate Medical Care
 
 
 22
 Plaintiff argues that the City was put on notice of Suttles' history of mental problems and failed to respond accordingly, thus showing a deliberate indifference to his serious needs. Plaintiff Jessie Mae Suttles testified that at the time the family attempted to have Suttles released on bond, she told Officer Gass, who was in charge of booking, that her husband was "sick." The testimony of Officer Gass confirms that he was told by family members that Suttles was sick, but he was never told that Suttles was on any medication or had been hospitalized in psychiatric institutions. According to Officer Gass, when he offered to assist the family in having Suttles released to them, family members responded, "No, we don't want him out. We can't control him. So, you keep him."
 
 
 23
 Mrs. Suttles further testified that she told the General Sessions judge that her husband was sick and should be put in a hospital. Maxine Cousin Jones, daughter of the deceased, testified that her brother told police officers of her father's past mental problems and that she told Sergeant Burrell that her father was sick. She did not tell Sergeant Burrell that her father had been institutionalized for mental problems, but thought that from his training, Sergeant Burrell should have known something was wrong after her father had not eaten in six days. Furthermore, jail officials received numerous complaints from other prisoners regarding Suttles' bizarre behavior. We cannot say, however, that the trial court erred in holding that there was insufficient evidence from which a jury could conclude that any City jail personnel knew of Suttles' past treatment for mental illness, although there was evidence from which a jury could conclude that jail officers knew Suttles suffered from mental problems.
 
 
 24
 Plaintiff alleged that the City did not have a policy to identify and protect mentally ill prisoners, and that this lack of policy caused Suttles' death. Plaintiff contends that Suttles should have been separated from the general population and closely watched to protect him from other inmates and himself. Testimony at trial established that the City did not have a procedure for screening prisoners with mental problems. Failure to make policy may be actionable under section 1983. Jones v. City of Chicago, 787 F.2d 200, 204-05 (7th Cir.1986). The physician who treated Suttles on December 1st after the altercation with Williams and Carson, however, did not recommend that he be placed in a separate cell or otherwise specially treated. Nor was there testimony that Suttles should have been sent to a psychiatric facility or otherwise dealt with. Also, the state director of corrections testified that the officers were correct in placing Suttles in the general population after he returned from the hospital. Moreover, there is no evidence from which the jury could find that Suttles' death was caused by his imprisonment in the general population.
 
 
 25
 Testimony also showed that there was a policy to take ill and injured prisoners to the local hospital and that the officers involved in the incident knew of this policy. The individual officers did not exhibit deliberate indifference to Suttles' medical needs. He was taken to the hospital at the time of his arrest, but refused treatment. He was again taken on December 1 after the altercation with Carson and Williams and was released by the emergency room physician after examination and treatment. Lastly, he was transported by ambulance to the hospital after receiving CPR by a jail officer when found comatose in his cell. Finally, officer training included lectures by mental health professionals on recognizing and handling people with mental problems.
 
 
 26
 All jailers on the shift during which Suttles apparently received his fatal injury were dismissed with plaintiff's consent at the close of plaintiff's proof. Since these officers were not found guilty of deliberate indifference to medical needs, the City cannot be found to be guilty of deliberate indifference. City of Los Angeles v. Heller, 475 U.S. 796 (1986). Accordingly, the district court correctly determined that there was not sufficient proof to go to the jury on the issue of whether the City had a policy of deliberate indifference to the serious medical needs and whether this policy and the actions of individual officers provided an affirmative link to the death of Suttles. See Estelle v. Gamble, 429 U.S. 97 (1976) (prisoners); Roberts v. City of Troy, 773 F.2d 720 (6th Cir.1985) (pre-trial detainees).
 
 
 27
 To summarize, we conclude that the evidence was insufficient to support a jury finding of a policy or custom of the City that violated constitutional standards or that such violation, even if found, was affirmatively linked to this death.
 
 
 28
 Accordingly, we AFFIRM the judgment of the district court.