Henry **POLLARD** and **Elia Marie Pollard**, Plaintiffs,

v.

**CITY OF CHICAGO**, Lester Dickinson, John D'Amico and Jerry Dalton, individually and officially, Defendants.

No. 85 C 0009.

United States District Court, N.D. Illinois, E.D.

July 25, 1986.

John L. Gubbins, Chicago, Ill., for plaintiffs.

Anne M. Burke, Algis Baliunas, Darka Papushkewych, Michael Small, James D. Montgomery, Chicago, Ill., for defendants.

## ORDER

NORGLE, District Judge.

The Court's last encounter with this lawsuit resulted in dismissal of Plaintiff's, Henry Pollard ("POLLARD"), federal and pendent state claims. *See* Order, #85 C 9 (August 7, 1985). Pollard has since filed an amended Complaint. The Defendants, City of Chicago ("CITY"), Lester Dickinson ("DICKINSON"), John D'Amico ("D'AMICO") and Jerry Dalton ("DALTON"), filed a motion to dismiss the first amended Complaint. For the following reasons Defendants' motion is granted in part and denied in part.

The amended Complaint contains the following allegations:[1] Pollard began working for the City of Chicago in 1971. Along the way he advanced to the position of motor truck driver for the Department of Streets and Sanitation ("DEPARTMENT"). During Pollard's term of employment, Dickinson was the Commissioner of the Department, D'Amico was the Commissioner of the Bureau of Forestry (a division of Department) and Dalton was the General Superintendent of the Bureau.[2]

On July 20, 1983, Pollard complained to D'Amico about the duties a pregnant employee was required to perform at a De-

---

1. As always, the allegations contained in the amended Complaint are taken as true for the purposes of this Rule 12(b)(6) motion to dismiss. Additionally, Pollard receives the benefit of all favorable inferences arising from those allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984).

2. Pollard alleges all three Defendants (Dickinson, D'Amico and Dalton) had the power and authority to transfer and suspend employees. Amended Complt at 2, ¶ 6–8. Even though no support is provided for such a statement, the allegation is taken as true for purposes of this motion.

partment facility. Pollard also alleged that the woman, a black, was the victim of harassment and humiliation by white males at the facility. D'Amico was informed of Pollard's expressions of concern for the physical and emotional effects of such treatment on the woman.

Some six days later Pollard had the first of two meetings with Dickinson. Plaintiff repeated the concerns he had voiced to D'Amico with the addition of a photographic display and some charges that certain employees had abused their positions. Pollard charged that 1) supervisors made false mileage claims, 2) some employees were splitting logs on Department property with Department equipment and the split logs were sold for the personal gain of certain supervisors, 3) Department funds were misused to purchase personal items for certain supervisors and 4) other work was performed for the personal benefit of certain supervisors. Amended Complt at 3, ¶ 11.

The next day Plaintiff was summoned to D'Amico's office. D'Amico told him to "forget" about all the matters he had raised before Dickinson. He also told Plaintiff to destroy the pictorial display. Plaintiff waited approximately one month before filing an official complaint with the Office of Municipal Investigations ("OMI").[3] Plaintiff presented his evidence to an OMI investigator, and alleges OMI never contacted Plaintiff about the matter. Perhaps in response to OMI's inactivity, Plaintiff set out to collect additional evidence to substantiate his charges.[4]

On September 14, 1983, Plaintiff observed Dalton exiting the Calumet Park Municipal Building. Plaintiff began taking photographs and Dalton rushed at Plaintiff, threatened him and pounded on the side of Plaintiff's car. When a policeman arrived, Dalton stated the "damn nigger is harassing me." Despite Dalton's charge, Plaintiff was told he was free to go. Five days later, however, Chicago Police Officers appeared at Plaintiff's Chicago residence and arrested him for the Calumet Park incident. Plaintiff was informed that Dalton had filed a complaint for "threatening a public official and ... aggravated assault." Amended Complt at 4, ¶ 15. Pollard was arrested, taken to the station house and released on bond.[5] Pollard cites Dalton's complaint as one in a series of harassments he has suffered on and off the job "by agents and employees of the City of Chicago."[6] Amended Complt. at 4, ¶ 18.

---

**3.** Pollard does not identify the subject matter of the OMI complaint, but it is fair to infer Dickinson and D'Amico were named. *See* Amended Complt at 3, ¶ 13 ("[Pollard] showed photographs and other evidence to ... Officer Merola which backed up his charges."). After a long period of OMI inaction, Plaintiff was notified (by OMI investigators) that he too was the subject of an OMI investigation. That investigation, OMI said, focused on Plaintiff's alleged violation of Personnel Rule VIII, § 1(m), which makes it a violation to physically abuse another City employee. Pollard alleges Dalton initiated the OMI investigation in order to harass and retaliate against him. Pollard also alleges D'Amico and Dickinson acquiesced in Dalton's action.

**4.** Amended Complaint ¶ 14 states that Pollard sought out additional evidence "on his own time." The Court interprets that phrase as meaning Pollard conducted his search outside the time and place of his employment. It is worth noting at this point that *all* of Pollard's allegations thus far have involved abuses taking place *within* the time and place of his employ-

ment. Pollard's attempt to go outside the sphere of his employment for corroborating evidence, is, on its face, a bit incredible. *See infra* discussion of first amendment claims at note 12.

**5.** The complaint against Pollard was stricken because Dalton (the complainant) failed to make an appearance for two court dates. Amended Complt at 4, ¶ 17. However, in April, 1984 Pollard was informed by the Chicago Police Department that charges had been refiled against him. Pollard alleges Dalton refiled the charges in 1984 in order to retaliate against and harass Plaintiff.

**6.** Pollard does not state the "agents and employees" of City are the named Defendants. *See* Amended Complt at 4, ¶ 18. The Court interprets the "agents and employees" euphemism to apply *only* to the persons named as Defendants in this lawsuit—Dalton, D'Amico and Dickinson. If Pollard intends a meaning different from the one taken by the Court, he has two alternatives: 1) file a motion to amend his amended Complaint or 2) file a motion to add additional defendants.

The additional harassments suffered by Pollard are: a) phony complaints about the quality of his work, b) verbal abuse from Dalton [7] and c) anonymous phone calls of a threatening nature received at his home.[8]

The amended Complaint contains additional harassing or retaliatory actions taken by the Defendants against Pollard. For example, on September, 1983 Pollard was transferred from his mail driver position to that of line truck driver. Pollard alleges Dalton performed the transfer to harass and retaliate against him. D'Amico and Dickinson are alleged to have acquiesced in the transfer with the same motivation. Similarly, Pollard alleges Dalton also engineered his two day suspension on a trumped-up charge;[9] again D'Amico and Dickinson acquiesced in Dalton's action. In April, 1984 Pollard was transferred a second time by Dalton; and in July, 1984 a third time. In each of these instances Pollard alleges Dalton was motivated by an intention to harass or retaliate against Plaintiff and that D'Amico and Dickinson acquiesced in the transfers.

In Count I Pollard claims the three transfers initiated by Dalton and joined in by D'Amico and Dickinson were intended to harass and retaliate against Plaintiff for his exercise of first amendment rights. Additionally, Count I claims Dalton further deprived Plaintiff of his first amendment rights by initiating a) two criminal actions and b) an OMI investigation. Count II incorporates all of Court I but alleges Dalton imposed additional terms and conditions on Plaintiff's employment because of Plaintiff's race (black).[10] Additionally, Pollard alleges his transfer from the mail driver position by Dalton was motivated by racial discrimination in violation of the fourteenth amendment and § 1983.[11]

Count III alleges a violation of § 1981 and is premised on Dalton's filing of criminal complaints against Pollard. Pollard alleges Dalton's decision to file the complaints was premised on race. Count IV is a § 1983 claim directed at City. That count alleges Dalton, D'Amico and Dickinson are City policy makers. Accordingly, Defendants' official action in transferring Plaintiff without reason or cause was a taking of property without due process of law as protected by the fourteenth amendment due process clause. Counts V through VII are pendent state law claims: Count V, abuse of process; Count VI, intentional infliction of severe emotional distress; Count VII, intentional infliction of severe emotional distress (to Mrs. Pollard).

## A. Count I: First Amendment Claims

■ Pollard alleges two general topics of protected speech for which he suffered harassment and retaliation: 1) the treatment received by a pregnant black employee and 2) charges that various supervisors abused their positions. Pollard's claims

---

7. Pollard alleges Dalton often called him a "black son of a bitch." Amended Complt at 4, ¶ 18.

8. Pollard specifically alleges one such phone call where the caller, identifying himself as a City employee, warned Mrs. Pollard that Plaintiff "would be killed if he did not stop bringing to light the abuses occurring within the Department." Amended Cmplt at 4, ¶ 18.

9. Pollard states that he was suspended by Dalton for "being away from his work station." He claims the charge was false because his "trip sheets ... accounted for his time." Amended Cmplt at 5, ¶ 20.

10. Pollard alleges he was required to make late deliveries while white drivers were not (amended Complt at 8, ¶ 35) and that white drivers were given overtime but Plaintiff was not (*id.* at ¶ 36). After Plaintiff's transfer, his mail driver position was given to a white supervisor (*id.* at ¶ 37).

11. Amended Complaint ¶ 39 alleges all three Defendants violated Plaintiff's fourteenth amendment rights because "their motives for removing Henry Pollard from his position as mail driver were in part based on his race." The Court reads this allegation to mean that Dalton is liable because he transferred Plaintiff and D'Amico and Dickinson are liable because they acquiesced in Dalton's decision. Nowhere else in the amended Complaint does Pollard allege that D'Amico and Dickinson actually removed Plaintiff from his mail driver position, but he does allege they acquiesced in Dalton's decision. The Court's interpretation avoids the inconsistency raised by the divergent allegations.

are subject to the two-step analysis stated in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Thus, the Court must determine if 1) Pollard spoke on matters of public concern and, if so, 2) whether the interest of a public employee (Pollard) in commenting upon matters of public concern outweighs the interests of the Department as an employer in promoting effective and efficient public service. *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1256 (CA7 1985); *Knapp v. Whitaker*, 757 F.2d 827, 838–39 (CA7 1985).

Whether a public employee's speech addresses a matter of public concern depends upon the content, form and context of the speech. *Connick*, 103 S.Ct. at 1690–91. But it is generally the content of the speech which is the most important factor. *Yoggerst v. Hedges*, 739 F.2d 293, 296 (CA7 1985). The content of the first topic of speech identified by Pollard concerns the treatment of a pregnant black employee.

Pollard told D'Amico the woman was required to open and close a heavy gate at a Department facility. He also told D'Amico and Dickinson that the woman was the victim of harassment and humiliation by white male employees. Pollard insists such speech is a matter of public concern because it "invokes overtones of racial and sexual discrimination." Pltf's Response at 5. To an extent, Pollard is right.

■ Pollard's comments regarding the woman's gate duties reveal no more than his personal disagreement with the decision to assign the woman to that post. In similar cases such speech has been characterized as a matter of personal, rather than public, concern. *See Knapp*, 757 F.2d at 840 (teacher's speech on classroom assignments and evaluations matters of personal concern). The same, however, cannot be said of Pollard's comments regarding incidents of sexual and racial harassment by white males.

There can be little doubt that incidents of racial and sexual discrimination are matters of social concern to the community. *See Connick*, 103 S.Ct. at 1691 n. 8. The

values inherent in civil rights and employment discrimination legislation speak of our society's resolve to address the evils of discrimination. *See, e.g.,* 42 U.S.C. § 2000e *et seq.* (proscribing employment discrimination on basis of race, color, religion, sex and national origin); 29 U.S.C. § 206(d) (proscribing discrimination in rates of pay based on gender); 29 U.S.C. § 621 *et seq.* (proscribing discrimination based on age); 42 U.S.C. § 1981 (proscribing discrimination based on race); 42 U.S.C. § 1982 (proscribing violations of federal rights generally). Thus, unlike Pollard's comments regarding the woman's duties (where no discrimination is apparent), speech identifying potentially actionable discrimination by government employees constitutes a matter of public concern. Neither the context nor the form of Pollard's speech contradicts the Court's finding.

■ The second topic of speech identified by Pollard is also a matter of public concern. Pollard alleges he spoke to Dickinson of supervisors in the Department who abused their positions. Pollard spoke of 1) false mileage reports, 2) misuse of City equipment, 3) misuse of City funds and 4) an unusual log selling venture. These matters clearly implicate the public interest in the public pocketbook. Taxpayers have an undeniable interest in the efficient execution of public business without waste and illegality. *See, e.g., Knapp*, 757 F.2d at 841 (public interest in allocation and administration of public funds).

■ Defendants suggest that a general public interest in supervisor abuses is vitiated by the manner in which Pollard spoke. They suggest such speech to a supervisor (an obviously limited audience) was not aimed at informing the public. But that is not the law. A public employee's speech does not lose its first amendment protection simply because the employee chooses to communicate privately with his employer rather than the public at large. *Givhan v. Western Line School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). Accordingly, the Court finds Pollard's

speech regarding certain supervisors' abuse of their positions is a matter of public concern.

■ Because Pollard alleges speech which touches matters of public concern, the Court must proceed to the second step of analysis—the *Pickering* balance. *Connick*, 103 S.Ct. at 1690; *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). A balance must be struck between Pollard's interest, as a citizen, in discussing matters of public concern with his supervisor and City's (Department's) interest, as an employer, in promoting the efficient delivery of public services. "The initial, and often determinative question is whether the speech interferes with [Pollard's] work or with the efficient and successful operation of the [Department]." *Knapp*, 757 F.2d at 842. On a motion to dismiss, with all favorable inferences going to Pollard, the Court cannot say that he can prove no set of facts which would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 2229, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1983). Thus, the Court need only note that the publication of both categories of speech at issue here would tend to aid the efficient operation of Department rather than hinder it. Race and sex discrimination are readily discernible as divisive elements which can significantly lower employee morale. Similarly, the waste of public funds and abuse of official position do not aid efficiency, but instead tend to lessen efficiency. In the context of this

lawsuit (and this motion), then, City's (Department's) interest in efficiently delivering services to the public does not outweigh Pollard's interest in bringing matters of public concern (discrimination, waste, inefficiency) to the attention of his supervisors. Accordingly, except for Pollard's statements regarding the black woman's duties, Defendants' motion to dismiss is denied.[12]

### B. Count II and § 1983

The Court reads Count II as alleging all three of the individual Defendants violated the equal protection clause of the fourteenth amendment. Pollard first alleges that Dalton transferred him from his position as mail driver because he is black. In support of that allegation, Count II states that after Pollard's transfer the mail driver position was occupied by a white supervisor. Thus, because the motivation for the transfer was based on race, Dalton is alleged to have violated Plaintiff's right to equal protection. Count II, fairly read, alleges the same violation against Dickinson and D'Amico because they knew Dalton's action was motivated by racial discrimination and nevertheless acquiesced in that decision.[13] *See* amended Complt at ¶ 19.

Pollard's second theory in support of an equal protection claim is that Dalton imposed different terms on Pollard's employment as a mail driver than he did for white mail drivers. For example, Pollard was required to make late downtown trips while white drivers were not and Pollard was

12. This ruling on Defendants' motions to dismiss does not, of course, suggest the outcome of Pollard's claims on summary judgment or at trial. *Connick* does more than imply that speech protected by the first amendment is *not* an absolute. *See* 103 S.Ct. at 1694 (discharge did not offend constitution where limited first amendment interest at issue did not require employer to tolerate action which would disrupt office, undermine authority and destroy close working relationship). Thus, a steadily mounting attack on a supervisor may reach an intolerable level of disruption so that an employee's first amendment interest is outweighed by a public employer's interest. *See Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1258–59 (CA7 1985) (employee's tactics, even though they constituted speech on a matter of public

concern, found so disruptive and "conflict creating" that *Pickering* balance tipped in favor of employer). *See also Knapp*, 757 F.2d at 843–45 (discussing a plaintiff's *Mt. Healthy* burden).

13. Amended Complaint ¶ 40 states "Defendant Dalton violated Plaintiff's fourteenth amendment rights and 42 U.S.C. Sec. [sic] 1983 because his overall treatment of Plaintiff on the job was based in part on Plaintiff's race." That allegation is indicative of the generality of Count II and the obscurity of the legal theory the Count is predicated upon. Nevertheless, because Defendants treat Count II as an equal protection claim and Pollard does not disagree, the Court regards Count II as alleging a violation of equal protection.

given little overtime work while white drivers received greater overtime work. Dickinson and D'Amico are not implicated by this second theory. City contends Count II should be dismissed because 1) a § 1983 claim based on a violation of equal protection is barred by Title VII; 2) there is no explicit allegation that Dickinson and D'Amico were acting under color of state law; 3) Count II fails to state a claim under the equal protection clause of the fourteenth amendment; and 4) Count II fails to state a claim for the supervisory liability of Dickinson and D'Amico.

At the outset the Court must address City's argument that the constitutional claim raised in Count II is barred by Title VII. As a matter of logic, if City is right, the Court need not reach the remainder of City's attacks on Count II.[14] But, as will be seen, City is not only wrong on this issue, it is unquestionably wrong. *See Trigg v. Fort Wayne Community Schools,* 766 F.2d 299, 301–302 (CA7 1985).

Citing *Keller v. Dept. of Social Services,* 616 F.Supp. 540 (D.C.Md.1985), City contends Pollard's "section 1983 claim for alleged employment discrimination cannot be maintained where Title VII provides a concurrent and more comprehensive coverage of the matter." That statement constitutes the entirety of City's argument on the point; City implies that no further explanation or authority is necessary.[15] Having raised the point and provoked a response from Plaintiff, the Court is required to address the issue.[16] But the brevity and lack of support for City's argument (at least in this circuit) imposes a burden which a court should not ordinarily bear. The parties are advocates and they should not seek (either through negligence, carelessness or intention) to alter the court's role in a lawsuit. Moreover, a court is ill prepared to assume the position of advocate for either or both parties—nor should it be.[17] The Court now turns to City's contention (such as it is) that Pollard's § 1983 claim is barred by Title VII.

City relies on *Keller.* Yet, with all due respect to Senior Judge Northrop, this Court believes *Keller* seriously misreads the Supreme Court's decision in *Great American Federal S. & L. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).[18] Further, if either Pollard or City

---

**14.** For example, if City is right and the Count II equal protection claim is barred by Title VII, then it simply doesn't matter whether Count II states a claim consistent with Rule 12(b)(6). City apparently disagrees because its preemption argument is raised as the very last argument in its brief. *See* Deft's Motion to Dismiss at 9–12.

**15.** Even if there were no controlling authority to the contrary in *this* circuit, City's "argument" would still be inadequate. As will be seen later, the authority relied upon by City (*Keller*) without explanation or argument must be considered along with the several well reasoned decisions by Judges in this circuit going in the opposite direction. *See, e.g., Zewde v. Elgin Comm. College,* 601 F.Supp. 1237, 1244–46 (N.D. Ill.1984); *Woerner v. Brzeczek,* 519 F.Supp. 517, 519 (N.D.Ill.1981). City's failure to cite and discuss such cases (even if City failed to discover *Trigg*) reveals a serious lack of respect for this Court.

**16.** Parties often toss tangential arguments into their briefs and it is a difficult task for any Court to decipher whether such arguments are seriously maintained or not. In cases where an argument is raised and the opponent cites controlling or persuasive authority to the contrary (usually on all fours) the matter is easily dealt with. Indeed, most movants tend to withdraw such issues in their Reply Briefs. But this case is different. City raised the issue, Pollard responded. Neither side cited any controlling authority and only Pollard *attempted* to analyze the point. *See* Pltf's Response at 10–11. City failed to mention the matter in its Reply Brief. Thus, the Court was required to address the matter—much to its disappointment.

**17.** When, as in this case, the parties file incoherent memoranda and their briefs fail to acknowledge controlling authority contrary to the positions they advocate, the Court is compelled to devote an inordinate amount of time to one motion at the expense of other litigants before the Court. Little value, however, would result from the bilateral imposition of a monetary sanction in this case.

**18.** For example, *Keller* ignores the holding of *Novotny.* *Novotny* narrowly held that rights created by Title VII could not be asserted through § 1985(3). 99 S.Ct. at 1351. The Court did not hold that Title VII displaced federal statutory and constitutional rights. Indeed,

had performed additional legal research on the issue, they would have discovered contrary controlling authority in this Circuit. *See Trigg*, 766 F.2d at 301–302. Still further, *Trigg* [19] states the law in this Circuit and the conclusion of the majority of Courts that have addressed the issue. *Trigg*, 766 F.2d at 302 ("a plaintiff may sue her state government employer for violations of the Fourteenth Amendment through § 1983 ... even if the same facts would suggest a violation of Title VII"). Accordingly, City's theory that Title VII bars Pollard's § 1983 claim is not well-received.

■ City's contention that Count II fails to allege adequately the individual Defendants acted under color of state law with regard to Pollard's transfer is also meritless. Even a cursory reading of the amended Complaint reveals the sufficiency of the allegations. All three Defendants are alleged to be Department policymakers. All three Defendants are alleged to have acted, consented to or acquiesced in the alleged discriminatory conduct which resulted in the alleged deprivations. City's theory for dismissal is based on an extreme and narrow reading of the amended Complaint; a reading which this Court rejects.

■ City manages a more effective attack on the first of Pollard's equal protection theories. Pollard alleges that his transfer from the mail driver position shows dissimilar treatment of employees. City contends this aspect of the equal protection claim is defective because Pollard fails to allege *similarly situated employees* were treated differently. Pollard acknowledges that after his transfer the vacant mail driver position was filled by a white supervisor. He also acknowledges that in order to sustain an equal protection claim he must allege similarly situated employees were treated differently. Pltf's Response at 9–10. *See Tigner v. Texas*, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124 (1940). The Court agrees with City. Pollard has failed to allege he was similarly situated with the supervisor who assumed the vacant mail driver position.

■ A complaint alleging a violation of equal protection based on dissimilar treatment must allege the Plaintiff was treated in a manner different from similarly situated individuals. Equal protection does not exist in a vacuum; "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner*, 60 S.Ct. at 882. Pollard's first theory fails because the allegations in Count II suggest a dissimilarity (rather than a similarity) between the situations of mail drivers and supervisors. For example, Pollard does not allege that other mail drivers were retained while he was transferred; nor does he allege that mail drivers and their supervisors have common duties, pay scales or any other similarity. Instead, Pollard rests on the inconclusive and ambiguous assertion that the mail driver posi-

---

both the majority and dissent in *Novotny* recognized that Congress did not intend to displace §§ 1981, 1982 and 1983 with Title VII. Justice Stewart, writing for the majority, acknowledged "consistent" congressional views and Supreme Court precedent which supported the conclusion that Congress intended no broad preemptive goal for Title VII. *See Novotny*, 99 S.Ct. at 2351 & n. 21. Justices White, Brennan and Marshall (in dissent) arrived at a similar conclusion which they would have extended to § 1985(3). *Id.* at 2358–61 & n. 19. Consequently, *Keller's* failure to even mention the *Novotny* Court's own qualification of its holding undercuts the impact of the *Keller* holding. Further, the Seventh Circuit's decision in *Trigg* cancels (at least in this Circuit) *Keller's* unsupported conclusion that a "mere assertion that constitutional rights have been violated does not *ipso facto* de-

feat the exclusivity of comprehensive statutory remedies." *Keller*, 616 F.Supp. at 543. *See also Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1204 (CA6 1984) (Title VII does not affect rights of state employees under § 1983). Judges should be wary of preempting (repealing, in essence) statutory rights and even more wary of preempting existing constitutional rights. *Keller* fails to speak to many issues and, in doing so, renders itself unpersuasive.

19. The Court located *Trigg* through a LEXIS search. But as a practical matter the case could have been found through more conventional research methods. *See, e.g.*, Shepard's United States Citations, Vol. 84, Part 1B at 610 (January, 1986) (Shepard's report of latest citations to *Novotny* ).

tion which he vacated was filled by a white supervisor.[20] Although Pollard is entitled to all favorable inferences on this motion, he is not entitled to judicial assumptions. Sustaining this aspect of his equal protection claim would require the Court to assume supervisors and drivers are similarly situated; an assumption the Court cannot make. Accordingly, Pollard's theory that he suffered an equal protection violation because of his transfer fails to state a claim. City's motion to dismiss the job transfer aspect of Pollard's equal protection claim is granted. The same fate does not befall Pollard's second theory in support of an equal protection claim.

■ Pollard's second theory is that it was a violation of equal protection for Dalton to impose different terms, conditions and burdens on him as a mail driver when other white mail drivers did not receive the same terms, conditions and burdens. This theory states a valid equal protection claim because Pollard has alleged 1) intentional discrimination (based on race) where 2) similarly situated employees 3) were treated differently. *See Tigner*, 60 S.Ct. at 882; *Shango v. Jurich*, 681 F.2d 1091, 1103–1104 (CA7 1982). *See also Peterson v. Lindner*, 765 F.2d 698, 705 (CA7 1985); *Whiting v. Jackson State University*, 616 F.2d 116, 122 (CA5 1980). City's motion to dismiss the second aspect of Pollard's equal protection claim is denied.

### C. Custom, Policy or Practice and City

■ City next argues that it should be dismissed as a Defendant in this case because Pollard fails to allege adequately the existence of a municipal policy, custom or practice which caused the constitutional deprivations alleged in the amended Complaint. *See Monell v. Dept. of Social Ser-*

vices, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court does not agree. At some level in City's bureaucracy there must be officials whose acts reflect City policy. Because City acts through its agents, municipal liability under § 1983 attaches to actions taken pursuant to the decision of a policymaker. *Reed v. Village of Shorewood*, 704 F.2d 943, 953 (CA7 1983). And a policymaker is one with the authority or responsibility for establishing final government action. *Pembaur v. City of Cincinnati*, —— U.S. ——, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Thus, municipal liability attaches "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official responsible for establishing final policy with respect to the subject matter in question." *Id.* Pollard's allegations satisfy these requirements. He alleges all three individual Defendants are City policymakers with the authority to transfer him from job to job within the Department. Additionally, he alleges all three Defendants engaged in a series of acts intended to harass and retaliate against and deprive him of his constitutional rights. *See Pembaur*, 106 S.Ct. at 1297–99. City's motion to dismiss it as a Defendant is denied.

### D. Count IV and Due Process

Count IV is premised upon the due process clause of the fourteenth amendment. Pollard claims he has a protectible property interest in his employment with Department. The basis for such a property interest, claims Pollard, is Department's "longstanding custom and policy in which employees with less seniority are transferred or reassigned ahead of those with more seniority when involuntary transfers are involved." Amended Complt at ¶ 44.

---

**20.** Indeed, the only inference that can be drawn from Plaintiff's use of the terms "mail driver" and "supervisor" in the amended Complaint is that those titles denote different and distinguishable employees with different and distinguishable duties. Thus, the Court cannot reasonably draw the inference (favorable to Plaintiff) that mail drivers and supervisors are similarly situ-

ated. Further, the Court notes that, should Plaintiff seek leave to amend on this point, Rule 11 sanctions may come into play if no basis exists to support a theory of the similar situation of the two groups. *See Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927, 931–33 (N.D. Ill.1985).

Thus, Pollard claims Dalton's initiation of the transfers in violation of Department's longstanding custom deprived Pollard of a property interest without due process of law. But Pollard doesn't say whether he is complaining of substantive or procedural due process violations. Pollard's identification of a property interest, as well as his citations, suggests he is complaining about the lack of procedural due process attending his various transfers. *See* Pltf's Response at 13–14; *see, e.g., Auriemma v. City of Chicago,* 601 F.Supp. 1080 (N.D.Ill. 1984); *Begg v. Moffitt,* 555 F.Supp. 1344 (N.D.Ill.1983); *Hermes v. Hein,* 511 F.Supp. 123 (N.D.Ill.1980). And, indeed, Pollard fails to identify any source in constitutional law for the substantive right of a public employee to be transferred according to seniority. Accordingly, the Court need not seek out a source for Pollard's substantive rights; Count IV is subject to analysis as a procedural due process claim.

City's motion to dismiss Count IV is premised upon Pollard's weak claim to a property interest. City's view is that Pollard suffered a "lateral transfer." He was transferred from one driver position to another without suspension, demotion or discharge. Thus, City apparently argues, because Pollard was not discharged and has but a weak claim of entitlement to continual employment in the *same* position, the due process clause of the fourteenth amendment offers him no procedural protection.

In *Auriemma* several former Police Department commanders claimed City followed a practice of firing and demoting employees because they did not support Mayor Washington's mayoral campaign. Those Plaintiffs claimed their demotions (from high ranking Police Department positions) violated the due process clause of the fourteenth amendment because they were unjustified (without cause) and without a hearing. City moved to dismiss the claim on the theory that Plaintiffs had no claim of entitlement to their former positions. Hence no property interest was alleged.

After receiving City's motion to dismiss, the Plaintiffs amended their complaint to include an allegation that the demotions violated a longstanding departmental policy and custom that employees would be demoted or fired *only* for cause. Relying on *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), Judge Aspen concluded the allegation of a long-standing department policy adequately alleged a protectible property interest.

*Perry* held that a protectible property interest may arise from "mutually explicit understandings" between employer and employee. *Perry,* 92 S.Ct. at 2699. Thus, the policies and practices of a government employer may imply an "unwritten 'common law' " of the work place. 92 S.Ct. at 2700. But *Perry* involved a claim of entitlement to continued employment—not a claim of improper demotion, or improper transfer. 92 S.Ct. at 2697. Judge Aspen was applying *Perry* to a different claim—improper demotion—and Pollard asks this Court to apply *Perry* to still another claim—improper transfer. And such an extension, absent termination, is the same kind of issue addressed in *Brown v. Brienen,* 722 F.2d 360 (CA7 1983).

*Brown* involved a due process claim by county employees under the due process clause of the fourteenth amendment. The county had an ordinance requiring time off for employees who worked overtime. Certain employees worked overtime, but were never granted the equivalent time off or payment. The employees claimed the ordinance gave them a property right which was taken away without due process by the failure to grant equivalent time off or payment. The county's refusal to grant time off was, of course, a breach of contract. But, unlike *Perry,* the refusal to provide compensation for overtime did not lead to discharge or termination (either actual or constructive). According to the Court, the refusal only led to frustration, relief for which could be obtained in state court in a lawsuit for breach of contract. *Brown,* 722 F.2d at 365. *See also Altman v. Hurst,* 734 F.2d 1240, 1244 (CA7 1984) (per curiam) ("since plaintiff remains in the em-

ployment of the ... Police department, there is no deprivation of a property or liberty interest cognizable under section 1983"). *See also Parrett v. City of Connersville*, 737 F.2d 690, 693 (CA7 1984).

■ *Auriemma* is not necessarily inconsistent with *Brown*. A demotion (*Auriemma*) is closer to a termination (*Vail*) than is a dispute regarding overtime (*Brown*). *Brown* suggests that, absent termination, it is the significance of the interest, not simply the existence of an interest, which leads to the conclusion that a deprivation is sufficient to implicate the fourteenth amendment. In this case the scale tips against the finding of a property interest sufficient to implicate the due process clause of the fourteenth amendment. Pollard was not fired, he did not resign, he was not demoted, he did not suffer a decrease in pay or benefits. Pollard suffered a lateral transfer. If that transfer was performed in violation of written or oral rules or policies, Pollard may sue in state court for breach of contract, but he may not bring a claim under the due process clause of the fourteenth amendment. City's motion to dismiss Count IV is granted.

### E. Counts VI and VII and Severe Emotional Distress

These Counts allege the totality of the individual Defendant's activities constitute the intentional infliction of severe emotional distress upon Pollard (Count VI), and his wife (Count VII). Before addressing City's motion to dismiss the counts for failure to state a claim, the court must address the jurisdictional issue of the propriety of Mrs. Pollard's position as a Plaintiff in this lawsuit.

Count VII alleges the individual Defendants intentionally inflicted severe emotional distress upon Mrs. Pollard. The Count alleges she is a resident of Kentucky, the appropriate amount in controversy and that subject matter jurisdiction is proper under 28 U.S.C. § 1332 (diversity of citizenship). City does not contest this Court's subject matter jurisdiction based upon diversity.

Instead, City characterizes Mrs. Pollard as a pendent party and insists she should be dismissed because pendent party jurisdiction is generally improper in civil rights cases.

■ Pendent jurisdiction is discretionary jurisdiction. A federal Court may exercise pendent jurisdiction (subject matter jurisdiction) over a related state law claim when that claim and the federal claim "comprises but one constitutional 'case'." *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966). The test is whether the state and federal claims arise from a common nucleus of operative fact such that a plaintiff ordinarily would be expected to try all of the claims in one judicial proceeding. *Id.* 86 S.Ct. at 1138. Where the *Gibbs* test is met, no independent basis for subject matter jurisdiction over the state claim need be asserted. *See generally*, Wright, Miller and Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3567.1 at 118–120.

■ If this were Mrs. Pollard's lawsuit she would have little difficulty in meeting the *Gibbs* test with her state law claim. But pendent party jurisdiction is slightly different. In such a case, an additional plaintiff seeks to join a related claim against a defendant who is already in the lawsuit. *See, e.g., Zabkowicz v. West Bend Co.*, 789 F.2d 540, 545–48 (CA7 1986) (stating and applying two-prong test for pendent party jurisdiction); *Vantine v. Elkhart Brass Mfg. Co.*, 762 F.2d 511, 518–19 (CA7 1985) (same). Yet there is generally no bar to bringing in an additional plaintiff where that plaintiff's claim carries an independent basis for subject matter jurisdiction. *See Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 2421–22, 49 L.Ed.2d 276 (1976). *Cf. Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978). Mrs. Pollard alleges diversity jurisdiction supports her state law claim. Defendants' do not contest the point. Thus, an independent basis for subject matter jurisdiction over Mrs. Pollard's state law claim does exist. And

City's citation of cases refusing to exercise pendent jurisdiction in civil rights cases where *no* independent basis for subject matter jurisdiction is shown to exist (*see, e.g., Walters v. Village of Oak Lawn,* 548 F.Supp. 417, 419–20 (N.D.Ill.1982) are not on point. City's motion to dismiss Mrs. Pollard as an improper pendent party is, therefore, denied. *See generally* Wright, *The Law of Federal Courts,* 31–32, 107–09, 142–43 (4th ed. 1983).

 The Court now turns to the sufficiency of the allegations in Counts VI and VII to state a claim for the intentional infliction of severe emotional distress. Pollard must plead and prove that defendants 1) intentionally engaged in 2) extreme and outrageous conduct 3) causing the plaintiff to suffer 4) severe emotional distress. *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765 (1977); *Farnor v. Irmco Corp.,* 73 Ill.App.3d 851, 29 Ill.Dec. 894, 898, 392 N.E.2d 591, 594 (1st Dist.1979).

City's sole argument supporting dismissal of Counts VI and VII is that the conduct of Defendants is not so extreme and outrageous to have caused severe emotional distress to Pollard or his wife. Taking the amended Complaint's allegations as true (for the purposes of *this* motion) Pollard was 1) the recipient of several threatening phone calls which he believes originated with Defendants, 2) subjected to racially abusive treatment on the job, 3) the victim of a baseless criminal complaints and 4) transferred three times within the Department. Whether the allegations contained in the amended Complaint constitute extreme and outrageous (and thus actionable) conduct requires an objective analysis of all the facts. *Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157 (1961). Viewing Pollard's allegations in that light inescapably leads to the conclusion that both Mrs. Pollard (*compare Bureau of Credit Control v. Scott,* 36 Ill.App.3d 1006, 345 N.E.2d 37, 39 (4th Dist.1976) *with Farnor v. Irmco Corp.,* 73 Ill.App.2d 851, 29 Ill.Dec. 894, 898–99, 392 N.E.2d 591, 595–96 (1st Dist. 1979)) and Mr. Pollard (*see Sherman v.*

*Field Clinic,* 74 Ill.App.2d 21, 29 Ill.Dec. 597, 603, 392 N.E.2d 154, 159–60 (1st Dist. 1979)) state a claim. No further discussion is necessary. City's motion to dismiss Counts VI and VII is denied.

IT IS SO ORDERED.