**Arvie THOMAS, Plaintiff,**

v.

**CITY OF ZION, et al., Defendants.**

**No. 85 C 5952.**

United States District Court,
N.D. Illinois, E.D.

June 2, 1987.

Redina Friedman, Chicago, Ill., for plaintiff.

Leroy A. Garr & Associates, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Plaintiff Arvie Thomas has brought this three-count complaint under 42 U.S.C. § 1983 for injuries he sustained after several police officers from the City of Zion repeatedly used a "stun gun" in subjecting him to arrest. All three counts allege that the use of the stun gun violated plaintiff's constitutional right to be free from excessive force. Currently before the court is the motion of defendant City of Zion for summary judgment on Counts II and III. Count II alleges that the City is liable because the police officers complied with the official policy on how to use stun guns, and this compliance caused plaintiff's injuries. Count II also suggests that Commissioner Jimmy Booth, who was present at the scene of the incident, approved of the police officers' use of the gun and thereby made the officers' use of the gun "official policy." Count III alleges that the City is liable because it had a policy of failing to train its police officers on how to properly use the stun gun, and this failure caused plaintiff's injuries. For the reasons stated below, the City's motion for summary judgment is granted in full.

### Statement of Facts

Summary judgment is appropriate only if the pleadings, answers to interrogatories, admissions, affidavits, together with other evidentiary materials show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The reviewing court must view the entire record and draw all reasonable inference from the record in the light most favorable to the nonmoving party. *Reardon v. Wroan*, 811 F.2d 1025, 1027 (7th Cir.1987). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Wilmes v. United States Postal Service*, 810 F.2d 130, 131–32 (7th Cir.1987). Once the moving party has demonstrated this, the nonmovant cannot rest on general allegations or denials in his pleadings, but rather must show through evidentiary material that a specific factual issue exists. *Valentine v. Joliet Township High School District*, 802 F.2d 981, 986 (7th Cir.1986). Furthermore, a mere factual dispute will not preclude summary judgment unless the disputed fact is determinative according to the governing law. *Shlay v. Montgomery*, 802 F.2d 918, 920 (7th Cir.1986). Finally, if the nonmovant is a party who bears the burden of proof on a substantive issue and he fails to make a showing sufficient to establish an element essential to his case, entry of summary judgment against that party is mandated by Rule 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). With these principles in mind, I find the following to be the facts.

On November 17, 1984, plaintiff was subjected to an arrest with the use of an electronic "stun gun." One officer used the gun twice for a delayed blast of five to ten seconds, maybe more. Brooks Dep. at 29. A second officer also used the gun during the arrest. Bridges Dep. at 24–26. A City of Zion police department "directive" from Chief of Police Norman E. Lee was in effect at this time regarding the use of the stun gun. It had gone into effect on November 15, 1984. See Directive 21B. Under section 4.1 ("How To Use Stun Gun") it states first that "[a] short blast of ¼ to ½ second duration will startle suspect, cause minor muscle contractions and have a repelling effect." It then states that a "moderate length blast

of 1 or 2 seconds can stun an attacker, cause more severe muscle spasms, some mental confusion and make an assailant unwilling to continue attack." Finally, at the end of the "How To Use" section, it states:

A full charge of 2 or 3 seconds can immobilize an attacker, cause disorientation, loss of balance and leave them weak and dazed for 2 or 3 minutes. NOTE: *When using full charge, suspect should be held on to and assisted to the ground to prevent injury if possible.* (emphasis original)

This directive was superseded by a revised directive on June 28, 1985. See Directive 21B (revised), issued by Chief of Police Lester K. Guthrie, Jr. The "How To Use" section of this revised directive is identical to the original directive except that it contains one additional relevant provision: "No more than one stun gun is to be used on one suspect at a time."

Jimmy Booth is Public Health and Safety Commissioner for the City of Zion. Booth Dep. at 7. He was present at the arrest of plaintiff. *Id. passim.* Booth is a policymaker for budgetary decisions affecting the police and fire departments. *Id.* at 8–9. He does not have authority over the day-to-day operation of the police department. *Id.* at 9, 53. Rather, when a request is made of the police which might affect budgetary concerns, Booth's permission is necessary before the request may be granted. *Id.* at 9. For example, if a citizen might want extra police protection, Booth's permission is necessary. *Id.* Booth explained that his approval was not necessary for the police department to authorize the purchase of stun guns "as long as it was under the law in other departments." *Id.* at 38. (This statement is somewhat puzzling since no one may authorize something that is against the law.) But if the Chief of Police authorized the guns without Booth's permission, and Booth later decided that the gun "was not a good weapon," Booth would have the authority to discontinue the gun. *Id.* As it turns out, Booth authorized members of the police department to purchase stun guns out of the police budget if they so desired. *Id.* 37–39. Officers are entitled to a clothing allowance of $300 to $500 per person. *Id.* at 37. Booth had no objection to letting officers use their clothing allowance to purchase stun guns. *Id.* Booth's job as a commissioner is a part-time, elected post. *Id.* at 7. His full-time employment is a supervisor for buildings and grounds for the Zion Elementary School District, Number 6. *Id.* He earns $4,800 per year as a commissioner for the City.

On the night of the arrest, Booth was within eight to ten feet of where the stun gun was used. Bell Dep. at 29. However, Booth did not personally observe the use of a stun gun at the scene of the arrest. Booth Dep. at 34. The first time he learned that the gun had actually been used during the arrest was later that day back at the police station. *Id.* at 56. However, Booth did hear plaintiff yell quite loud during the course of the arrest. *Id.* at 31.

The two officers who used the stun gun on plaintiff were Edward Bridges and Wayne Brooks. Both Bridges and Brooks received training in the principles of stun gun use prior to the plaintiff's arrest. Bridges Dep. at 10–11; Brooks Dep. at 33. Both officers attended a seminar and witnessed a videotape covering the appropriate methods for safe and effective use of the stun gun. Bridges Dep. at 10–11; Brooks Dep. at 33. This seminar was part of a fully-attended meeting of sworn Zion police officers. Larry Booth Dep. at 42; Bridges Dep. at 10. The seminar may have been mandatory, see Larry Booth Dep. at 42; Bridges Dep. at 10; but see Augur Dep. at 8. However, even if the seminar was not mandatory (and plaintiff does not argue it was not), it is undisputed that everyone attended. See Larry Booth Dep. at 42. Besides witnessing the videotape, the officers at the seminar received the manufacturer's literature describing the proper use of the stun gun. Jimmy Booth Dep. at 40; Bridges Dep. at 11; Brooks Dep. at 33.

This fully-attended meeting of all sworn police officers of the Zion police department is also described in the affidavit of

Gordon Dean Ohmstead, a Zion police officer. He confirms that this meeting was conducted in early November, 1984, before deployment of the stun guns. He was present at the meeting and delivered an instructional talk on the use of the gun. The basis for his remarks was a combination of information received through oral communications with a training instructor employed by the manufacturer of the stun guns and printed literature supplied by the manufacturer to the police department. Ohmstead also confirms that the videotape was shown at this meeting. Finally, Ohmstead confirms that instructive and informational literature supplied by the manufacturer was circulated to those at this meeting. *See generally* Ohmstead Aff. ¶¶ 10–11.

### Legal Discussion

█ Counts II and III attempt to hold the City of Zion liable for the actions taken by Bridges and Brooks in their use of the stun gun on plaintiff. Under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a plaintiff may establish municipal liability for a deprivation of his constitutional rights (such as excessive force) only if he can show the existence of a municipal policy or custom and a sufficient causal link between the policy or custom and the constitutional deprivation. *Id.* at 690–94, 98 S.Ct. at 2035–38. Municipal liability can be established not just by proof of an unconstitutional policy or custom which causes an injury, but also proof of a policy, which though not itself unconstitutional nevertheless causes an unconstitutional deprivation. *See City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). For example, certain instances of municipal *inaction* which lead to unconstitutional injuries may produce *Monell* liability, even though the inaction alone is not unconstitutional. *Jones v. City of Chicago,* 787 F.2d 200, 204–05 (7th Cir.1986).

█ While cities are readily liable for policies which are themselves unconstitutional and which cause injury, *see Tuttle,* 105 S.Ct. at 2436, for a city to be liable for a policy which is not itself unconstitutional,

such as the city's failure to promulgate procedures or properly train personnel, there must be an extremely high degree of municipal culpability. *Lenard v. Argento,* 699 F.2d 874, 875 (7th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). Specifically, the city's failure to act must be the product of its "deliberate indifference" to the plaintiff's constitutional rights. *Jones,* 787 F.2d at 205. Stated another way, the municipality must be "aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures." *Jones,* 787 F.2d at 205. *See also City of Springfield v. Kibbe,* —— U.S. ——, 107 S.Ct. 1114, 1121, 94 L.Ed.2d 293 (1987) ("the 'inadequacy' of police training may serve as the basis for § 1983 liability" against a city, but "only where the failure to train amounts to a reckless disregard for or deliberate indifference to the rights of persons within the city's domain") (O'Connor, J., dissenting from a dismissal of a writ of certiorari as improvidently granted, with whom Rehnquist, C.J., White, J., and Powell, J., join).

In this case, plaintiff seeks to pin liability on the City of Zion in three ways. First, plaintiff argues (in his complaint) that Bridges and Brooks used the stun gun on plaintiff "in compliance with" the official policy of the City of Zion with respect to stun guns. Second Am.Comp. ¶ 9. The "official policy" plaintiff proffers is the original Directive 21B. Plaintiff's second theory for holding the City liable is that, "irrespective of the written policy," the presence of a policymaker (Commissioner Jimmy Booth) at the scene of the arrest, and his knowing acquiescence in the use of the stun gun, means that the way Bridges and Brooks used the guns during the arrest was tantamount to an "official policy." This theory derives from *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (a policymaker's decision can constitute "official policy"). Plaintiff vigorously argues this theory in his briefs as well as alleging it in the complaint. These first two theories are part of Count II. The third and final theory of

liability, contained in Count III, is that the City failed to adequately train its officers on the proper use of stun guns and because of this failure plaintiff has been injured. I address each of these theories in turn.

■ The first theory—that Brooks and Bridges used the gun in compliance with Directive 21B—is completely unsupported. The record shows that Brooks used the stun gun for two blasts of at least five to ten seconds each. Bridges also used a stun gun for an unspecified blast. Directive 21B, in effect on November 17, 1984, however, states that a stun gun is to be used only by delivering either a ¼ to ½ second blast, a 1 or 2 second blast, or a 2 or 3 second blast. The "How To Use" section does *not* authorize a blast of the stun gun beyond three seconds. It also does not authorize more than one stun gun to be used at a time. (Indeed, the revised Directive 21B specifically forbids this.) Thus, the actions of Bridges and Brooks, while arguably unconstitutional themselves, were not the written policy of the City of Zion. These two officers used the gun in a manner which did not implement the express policy of the City. Consequently, since plaintiff has failed to show that Bridges and Brooks were actually executing the written policy of the City of Zion when they arrested plaintiff on November 17, their actions do not justify municipal liability, even assuming that the officers' actions were unconstitutional.[1]

■ The second theory is that the presence of Jimmy Booth at the scene of the arrest, and his knowing acquiescence in the use of the stun guns there, means that the way the arresting officers used those guns was official, albeit unwritten, policy. This theory must fail for two reasons. First, there is no evidence in the record tending to show that Jimmy Booth had authority to establish official policy on how the stun gun may be used. He is the Public Health and Safety Commissioner. He is a policymaker, to be sure, but only on budgetary matters. Indeed, the only evidence available on the point shows that he does *not* have authority over the day-to-day operation of the police department. He does have authority to purchase or discontinue the use of stun guns, but this authority derives solely from his budgetary powers and responsibilities. In other words, while there is ample evidence that he has authority to discontinue (or commence) the use of stun guns, there is no evidence that he has authority over *how* they may be used. In fact, the evidence in the record over who controls how the guns may be used indicates only that it is the Chief of Police. The chief is the one who signed both directives (Directive 21B and the revised Directive 21B). As Booth explained it, the Chief of Police, not Booth, "operate[s] the day-to-day business of what goes on in the department." Booth Dep. at 9. Moreover, the Municipal Code of the City of Zion (section 21–3) provides that the "Chief [of Police] shall be responsible for the performance by the police department of all its functions and all persons who are members of the department shall serve subject to the orders of the Chief of Police." Section 21–8 of the Code then vests the Chief of Police with "binding" rulemaking powers over the police department. He thus regulates police officer actions. Plaintiff counters all this with no contrary authority suggesting that Booth also has policymaking powers over the actions of police officers. Instead, when all the evidence is reasonably construed in plaintiff's favor, it suggests only that Booth has power over the budgetary operations of the department and the Chief of Police has power

---

1. It could be argued that, although Bridges and Brooks were not actually executing written policy, they used the guns in a manner that was not inconsistent with the express language of the policy. This argument is actually just another way of contending that the City failed to properly regulate, restrain, or limit the use of stun guns. This contention is addressed in the part of the opinion dealing with plaintiff's "failure to train" theory.

It could also be argued that, even though Bridges and Brooks were not executing written policy, and even though they went beyond that written policy, the policy was nevertheless unconstitutional *as written* and this policy caused the officers to act as they did. Plaintiff, however, has made no attempt to argue this point and the court will not consider it.

over the guns. Booth Dep. 8–9. Thus, because it lacks any evidence in the record, the court rejects plaintiff's contention that Jimmy Booth had policymaking authority over how stun guns may be used during the November 17 arrest.

I reached this conclusion once before. In my Memorandum Opinion and Order of August 27, 1986, I explained that a "policy" could be inferred from the actions of a high level official exercising his or her policymaking authority. See slip op. at 3 (citing to *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 1300 (1986)). After examining the evidence regarding Booth's budgetary responsibilities, and the municipal regulations providing that the Chief of Police is entrusted with final policymaking authority regarding the use of force, I reached the following conclusion: "Booth's presence at the scene of plaintiff's arrest appears to be wholly unrelated to his municipal duties as a City Council Member and Commissioner. Under *Pembaur*, therefore, municipal liability cannot flow directly from Booth's acts." Slip op. at 3. My reexamination of the entire record as reflected in this opinion provides me with no reason to alter my original conclusion. The City cannot be held liable on account of Booth's presence at the scene because he does not exercise policymaking authority over how police officers execute an arrest.

There is a second reason for rejecting the idea that municipal liability can be predicated on Booth's presence. The only evidence in the record on the point is that Booth did *not* know that stun guns were used until after the arrest was over and he was back in the station. There is a dispute over how close Booth was to Thomas when the arrest occurred. I have accepted plaintiff's version that he was about eight to ten feet away. I also accept plaintiff's evidence that Booth heard plaintiff yelling during the arrest. None of this evidence, however, conflicts with Booth's testimony that he did not know the stun guns were being used. Moreover, it is plaintiff's burden, which he has not met, to adduce evidence that Booth did know of the use of the stun guns. Without any such evidence in the record, there is no basis for a trier of fact to conclude that Booth established unwritten policy by acquiescing in the officers' use of the guns. For acquiescence to constitute a "policy," it must be knowing. "Conscious acquiescence" is a requisite to municipal liability when it is based on a city policymaker's inaction. *Jones*, 787 F.2d at 204; *Tuttle*, 106 S.Ct. at 2436. Since there is no evidence here of conscious acquiescence, Booth's presence at the scene cannot produce municipal liability.[2]

Plaintiff's third theory of municipal liability is that the City failed to properly train its police officers (including Bridges and Brooks) on how to properly use the stun gun, or otherwise failed to adequately limit the use of stun guns, and that as a result of this inaction plaintiff sustained his severe injuries. This is a difficult theory to prove and plaintiff has adduced no evidence that would support it.

■ First, as discussed earlier, for municipal liability to be predicated on a theory of municipal *inaction* (such as a failure to properly train), a high degree of culpability is required. Specifically, the plaintiff must show that the City failed to act in reckless disregard or deliberate indifference to the constitutional rights of plaintiff. Thus, the City must either be aware of actual constitutional deprivations or there must be such a strong likelihood of imminent deprivations that any reasonable person would have taken preventative measures. *See supra* pp. 645–646. There is absolutely no evidence in this record suggesting that there were any constitutional violations in Zion arising from the use of stun guns prior to the November 17 arrest, let alone that the City actually knew of the violations. It is also doubtful that the record in this case could support a finding that the stun guns intrinsically posed such a grave

---

**2.** Thus, plaintiff's citation to *Pollard v. City of Chicago*, 643 F.Supp. 1244 (N.D.Ill.1986) is of no help. *Pollard* was a case where policymakers were alleged to have consented to unconstitutional conduct. The absence of evidence of "consent" here (which by definition must be knowing) renders this case inapplicable.

risk to people and were so easily misused that constitutional violations were imminent and a reasonable person would have taken preventative measures. *See* Ohmstead Aff. ¶ 9 ("A 'Stun Gun' is a hand-held electrical device which imparts a non-lethal electronic shock when applied to the body of an arrestee"); Booth Dep. at 41 ("the gun had been tested on a person that had open heart surgery with no recourse whatsoever"); but see *id.* (the instructor said "do not use the gun on the face"). But I do not have to decide this particular question of the imminence of a violation in the absence of training because the record here amply demonstrates that preventative measures were in fact taken.

As described earlier, all sworn police officers attended a seminar on the proper use of stun guns prior to their deployment. Literature was circulated, instructions were given, and a videotape was shown. Plaintiff argues that despite all this the training must have been inadequate because Bridges and Brooks used the stun gun for more than three seconds, contrary to Directive 21B. (Brooks said he used it for at least five to ten seconds.) Since they apparently but incorrectly believed this to be proper procedure, the training must have been inadequate.

This reasoning is flawed. A training program is not inadequate merely because a trainee has on one occasion failed to execute what he was supposed to have learned. Judging the program in its entirety (including the instructions, videotape, literature, full attendance at the seminar, *and* the failure of Brooks and Bridges), I doubt that this program was inadequate. It was a reasonable attempt to educate a police force as to the proper use of a new weapon. However, even if this training program could reasonably be judged inadequate, the inadequacy still could not serve as the basis for municipal liability. As explained before, for there to be municipal liability from inadequate training, the inadequacy must be in reckless disregard of plaintiff's rights. However, here, it cannot reasonably be said that this training program, albeit arguably inadequate, rose to the level of a reckless disregard for the rights of individuals. Put another way, one cannot reasonably say that this training program was so grossly deficient that the City should have realized there was a substantial possibility that, as a result of it, constitutional deprivations were imminent.

Plaintiff also argues that this training program was inadequate because there were no live demonstrations of the proper use of stun guns. Actually, the evidence is that the training seminar included a live demonstration. See Brooks Dep. at 33. But even if there was no live demonstration, the comments from the previous paragraph apply with equal force here. First, I question whether live demonstrations are necessary to make a training program adequate. But even if they are, one cannot reasonably say that the absence of live demonstrations made the training so deficient that the City should have anticipated that constitutional deprivations were quite likely.

In short, plaintiff's third theory does not afford him a basis for pinning liability on the City. There is no evidence that the City knew constitutional deprivations had occurred. Also, given the existence of the stun gun training seminar prior to the deployment of the guns, there is no reasonable basis for concluding that the City should have known constitutional violations were extremely likely.

### Conclusion

The motion of the City of Zion for summary judgment on Counts II and III is granted.

It is so ordered.